[No. G045580. Fourth Dist., Div. Three. Sept. 11, 2012.]

PAM RAGLAND, Plaintiff and Appellant, v.
U.S. BANK NATIONAL ASSOCIATION et al., Defendants and
Respondents.

184

## COUNSEL

Travis R. Jack for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Karin Dougan Vogel, J. Barrett Marum and Mark G. Rackers for Defendants and Respondents.

## OPINION

**FYBEL, J.**—

### INTRODUCTION

After Pam Ragland lost her home through foreclosure, she sued defendants U.S. Bank National Association (U.S. Bank), the successor in interest to the Federal Deposit Insurance Corporation (FDIC) as the receiver for Downey Savings and Loan Association (Downey Savings); DSL Service Company (DSL), the trustee under the deed of trust; and DSL's agent, FCI Lender Services, Inc. (FCI). (We refer to U.S. Bank, DSL, and FCI collectively as Defendants.) She asserted causes of action for negligent misrepresentation, fraud, breach of oral contract, violation of Civil Code section 2924g, subdivision (d) (section 2924g(d)), intentional and negligent infliction of

emotional distress, and rescission of the foreclosure sale. Ragland appeals from the judgment entered after the trial court granted Defendants' motion for summary judgment and summary adjudication.

■ Applying basic contract and tort law, we reverse the judgment in favor of U.S. Bank on the causes of action for negligent misrepresentation, fraud, violation of section 2924g(d), and intentional infliction of emotional distress. Ragland produced evidence creating triable issues of fact as to whether Downey Savings induced her to miss a loan payment, thereby wrongfully placing her loan in foreclosure, and whether she suffered damages as a result. We affirm summary adjudication of the causes of action for breach of oral contract, negligent infliction of emotional distress, and rescission, and affirm the judgment in favor of DSL and FCI because Ragland is no longer pursuing claims against them.

The FDIC took control of Downey Savings in November 2008 and later assigned its assets, including Ragland's loan, to U.S. Bank. For the sake of clarity, we continue to use the name "Downey Savings" up through December 17, 2008, the date of the foreclosure sale.

FACTS

I.

**Ragland Refinances Her Loan; Her Signature Is Forged on Some Loan Documents.**

In June 2002, Ragland refinanced her home mortgage through Downey Savings. She obtained the refinance loan through a mortgage broker. The loan was an adjustable rate mortgage with an initial yearly interest rate of 2.95 percent, and the initial monthly payment was $1,241.03.

Ragland thought that Downey Savings had offered her a fixed rate loan and claimed her mortgage broker forged her name on certain loan documents. In July 2002, she sent a letter to the escrow company, asserting her signature had been forged on the buyer's estimated closing statement and on the lender's escrow instructions, and, in September 2002, she notified Downey Savings of the claimed forgery. A handwriting expert opined that Ragland's signature had been forged on those two documents, and on a statement of assets and liabilities, an addendum to the loan application, a provider of service schedule, and an itemization of charges. By August 2002, Ragland had consulted two attorneys about the forged documents, one of whom wanted to file a class action lawsuit on her behalf, and the other of whom

advised her of her right to rescind the loan. Ragland signed, and did not dispute signing, the adjustable rate mortgage note, the deed of trust, and riders to both instruments.

## II.

### Ragland Seeks a Loan Modification; She Is Told to Miss a Loan Payment to Qualify.

By April 2008, the yearly interest rate on Ragland's loan had increased to 7.022 percent and her monthly payment had increased to over $2,600. On April 13, Ragland spoke with a Downey Savings representative named John about modifying her loan. John told Ragland her loan was not "behind" but he would work with her to modify it. He told Ragland not to make the April 2008 loan payment because "the worst thing that's going to happen is you are going to have a late fee, we will get this done for you." When Ragland asked if there was a chance the loan modification would not "go through," John replied, "usually not, you are pre-qualified."

John told Ragland a $1,000 fee would be charged to modify the loan, and Downey Savings would not waive that fee. She replied that Downey Savings should waive the fee because her "loan was forged and nothing was done about it." John said he would check with his supervisor about waiving the fee.

John did not call back, and on April 16, 2008, the last day to make a timely loan payment for April, Ragland, who was nervous about a late payment, called him. John told her nothing could be done about the loan, so she asked to speak to his supervisor. The supervisor told Ragland, "[i]f you have one document in your packet that's forged, you may not be responsible for anything in your loan, at all, you may not have to even pay your loan." When Ragland said she had 13 to 15 forged documents, the supervisor checked her record and told her, "I can see that you reported . . . this to us. We are going to have to put it in legal." The supervisor told Ragland that Downey Savings could not collect from her while its legal department investigated the forgery. Ragland had planned to make her April 2008 loan payment but, based on what John and the supervisor told her, manually cancelled the automatic payment from her checking account.

In late April 2008, Downey Savings sent Ragland a notice that her loan payment was delinquent. On April 29, 2008, Ragland spoke with Downey Savings representatives named Joseph and Claudia and made notes on the delinquency notice of her conversations with them. Ragland noted that Claudia or Joseph told her: "Can't do modi[fication] while investigat[e]

[¶] . . . Collection activity 'frozen.' " Claudia told Ragland that Downey Savings was initiating an investigation into her claim of forgery and could not accept further loan payments from her during the investigation. Ragland noted that Joseph also told her, "collection activity frozen."

No one from Downey Savings further discussed a loan modification with Ragland or requested financial information from her. Ragland testified in her deposition, "once it went into legal, that was it. It was like the legal black hole."

In May 2008, a withdrawal was made from Ragland's checking account and transmitted to Downey Savings as the May 2008 loan payment. Downey Savings refused to accept the payment.

On May 5, 2008, Downey Savings sent Ragland a letter entitled "Notice of Intent to Foreclose" (some capitalization omitted). According to the letter, the amount required to reinstate the loan was $5,487.80. On May 9, Ragland called Downey Savings in response to this letter. Her notes for this conversation indicate she spoke with "Reb," who transferred her to "Jasmine," who transferred her to "Lilia," who said the loan was in Downey Savings's legal department and "they[']ll C/B."

## III.

### Downey Savings Institutes Foreclosure Proceedings; Ragland Gets the Runaround.

Nobody from Downey Savings called Ragland back. In early July 2008, Ragland received a letter from Downey Savings's collection department, informing her that foreclosure proceedings on her home had begun. On July 15, Ragland had a telephone conversation with each of three Downey Savings representatives, identified in her notes of the conversations as Eric, Gail, and Leanna. Ragland spoke first with Eric, who told her the account was in foreclosure and transferred her to the foreclosure department. Ragland next spoke with Gail, who said she could not speak to her because the account was in foreclosure. Gail transferred Ragland to Leanna. Leanna told Ragland that the legal department failed to put a red flag in the computer to indicate the loan was being investigated and that the loan should never have been placed in foreclosure. Leanna told Ragland that Downey Savings was "waiting for legal," and Ragland's attorney needed to "write the letter to legal and ask them . . . for a status update on the investigation, and that we had time, because it had just been referred in June and the sale wasn't set for quite a while." Ragland's notes from the conversation include, "[f]oreclosure on hold."

## IV.

### Downey Savings Institutes Foreclosure Proceedings; Ragland Attempts to Make Loan Payments.

On July 18, 2008, Downey Savings instructed DSL, the trustee under the deed of trust, to initiate foreclosure proceedings on Ragland's home. DSL assigned its agent, FCI, to take the actions necessary to foreclose the deed of trust on Ragland's home.

Ragland attempted to make payments on her loan in September, October, and November 2008 through transfers from her checking account. Downey Savings rejected the payments.

On October 30, 2008, FCI recorded a notice of trustee's sale, stating the foreclosure sale of Ragland's home would be held on November 20. Ragland filed this lawsuit against Downey Savings on November 7, 2008. Several days later, Ragland's attorney, Dean R. Kitano, spoke with general counsel for Downey Savings, Richard Swinney, about Ragland's allegations of fraud and forgery in connection with the origination of her loan. Swinney agreed to postpone the foreclosure sale until December 9, 2008.

By letter dated November 12, 2008, Swinney informed Kitano that until Downey Savings received certain documentation from Ragland, it would not consider modifying her loan. The letter stated that any loan modification would require that she bring the loan current and described as "not credible" Ragland's contention that a Downey Savings representative told her to skip a monthly payment. The forgery issue, according to the letter, "has no impact on this loan" because Ragland did not claim her signatures on the disclosure statement, note, or deed of trust were forged.

Later in November 2008, the Office of Thrift Supervision closed Downey Savings, and the FDIC was appointed as its receiver. U.S. Bank acquired the assets of Downey Savings from the FDIC. Ragland's loan was among those assets acquired by U.S. Bank.

## V.

### Ragland's Home Is Sold at Foreclosure Sale on the Day After the Trial Court Denied Ragland's Motion for a Preliminary Injunction.

On November 12, 2008, Ragland filed an ex parte application for a temporary restraining order to enjoin the foreclosure sale scheduled for

December 9. The ex parte application was heard on November 26, on which date the trial court issued an order stating: "Plaintiff shall be entitled to a temporary restraining order enjoining the foreclosure sale on December 9, 2008; upon bringing the loan current by Dec[ember] 16. Current is as of Nov[ember] 26, 2008." A hearing on Ragland's motion for a preliminary injunction was scheduled for December 16, 2008.

Following the ex parte hearing, Downey Savings provided Ragland a statement showing the amount necessary to reinstate her loan was $24,804.57, of which about $4,074 was for late charges, interest on arrears, property inspection and foreclosure costs. Kitano sent Downey Savings a letter, dated December 2, 2008, stating that "[c]urrently, my client is unable to pay the arrearage to make the loan current" and proposing that (1) $12,000 of the reinstatement amount be "tacked onto the back end of the loan" and (2) Downey Savings forgive the remaining amount.

In advance of the hearing on Ragland's motion for a preliminary injunction, the trial court issued a tentative decision that stated, in part: "The court's order of November 26, 2008, conditions the TRO [(temporary restraining order)] on plaintiff's bringing her payments current as of November 26, 20[08] by no later than December 16, 2008. According to defendant, t[he] amount necessary to bring the loan current is $24,804.57. Plaintiff does not dispute that she owes regular monthly mortgag[e] payments on the loan, and therefore whether or not she is likely to prevail on the merits is not at issue insofar as her responsibilit[ies] to bring the loan payments current [are] concerned. If plaintiff fails to bring her payments current by the hearing date, there is no reason to issue a preliminary injunction, since the injunction would serve no purpose but to prolong the inevitable to no good purpose. . . . [¶] If plaintiff does bring her payments current by the hearing date, then there is no basis for a foreclosure sale because the arrears would have been cured. Hence there would seem to be no need for the issuance of a preliminary injunction under such circumstances."

Ragland did not pay the amount demanded by Downey Savings to reinstate the loan by December 16, 2008. She had sufficient funds to make the backpayments due under the note, but not to pay the additional fees.

On December 16, 2008, the trial court denied Ragland's motion for a preliminary injunction, and the foreclosure sale was conducted the next day. Ragland's home was sold at the sale for $375,000.

### MOTION FOR SUMMARY JUDGMENT

Ragland's third amended complaint asserted causes of action against U.S. Bank for negligent misrepresentation, breach of oral contract, and fraud, and

against Defendants for violations of section 2924g(d), intentional infliction of emotional distress, negligent infliction of emotional distress, and rescission of foreclosure sale.

In December 2010, Defendants moved for summary judgment and, in the alternative, for summary adjudication of each cause of action. In May 2011, the trial court granted the motion for summary judgment on the ground Ragland could not pay the full amount demanded by Downey Savings to reinstate her loan. The trial court ruled: "A valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust . . . . [Citation.] [¶] This rule . . . is based upon the equitable maxim that a court of equity will not order a useless act performed . . . if plaintiffs could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the plaintiffs. [¶] [Citation.] [¶] The defendants have shown that all of plaintiff's damages under each cause of action were suffered as a result of the foreclosure sale of her property. . . . Plaintiff alleges that the foreclosure sale occurred six days too early in violation of *Civil Code §2924g*. Even if this were true, plaintiff's damages are not recoverable because plaintiff was incapable of reinstating her loan. . . . This was made clear by plaintiff's counsel in his letter to Downey Savings' counsel two weeks before the foreclosure sale (December 2, 2008). Plaintiff's counsel stated that '. . . my client is unable to pay the arrearage to make the loan current . . . ['] . . . Plaintiff's failure to reinstate the loan by the December 16, 2008 preliminary injunction hearing confirmed as much, and plaintiff also admitted this in her deposition."

As to the contention that Ragland could have made the past due loan payments but not the added fees, the trial court ruled: "Plaintiff claims that she indicated in her deposition that she had the money to make up the back payments, but not enough money to also make up the fees. *Plaintiff's Separate Statement, page 6, lines 16–18*. The referenced deposition testimony amounts to a claim that plaintiff had only part of the money necessary to reinstate the loan." The court also rejected the contention that Ragland was prepared to file bankruptcy to delay the foreclosure sale, stating, "[t]his is a further admission that plaintiff was incapable of reinstating her loan even if the foreclosure sale had been delayed an additional six days."

Ragland timely filed a notice of appeal from the judgment entered in Defendants' favor.

REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE

## I.

## Ragland's Request for Judicial Notice

Ragland requests that we take judicial notice of 18 discrete facts concerning the financial condition of Downey Savings from 2005 to the time of its acquisition by U.S. Bank, the nature of Downey Savings's assets in that timeframe, the resale of Ragland's home, and the condition of the Orange County housing market. She argues those 18 facts are relevant to show "when Downey Savings' disastrous financial condition beg[a]n showing in late 2007, and bec[ame] clear by April, 2008, Downey's desperate need for cash explains its unusual behavior." She concedes, "[t]he matters concerning which judicial notice is requested were not presented to the trial court." We deny the request for judicial notice.

Ragland requests we take judicial notice pursuant to Evidence Code section 452, subdivision (h), which provides the court "may" take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." The Court of Appeal has the same power as the trial court to take judicial notice of matters properly subject to judicial notice. (Evid. Code, § 459.) " 'Matters that cannot be brought before the appellate court through the record on appeal (initially or by augmentation) may still be considered on appeal by judicial notice.' " (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 719, fn. 4 [13 Cal.Rptr.3d 88].)

As evidentiary support for the request for judicial notice, Ragland offers 12 exhibits, consisting of an audit report of Downey Savings, prepared by the Office of the Inspector General of the United States Department of the Treasury (exhibit 1), printed pages from various Web sites and blogs (exhibits 2–6 & 8–12), and a recorded grant deed (exhibit 7). Ragland's request for judicial notice requires us (with one exception) to take judicial notice of, and accept as true, the contents of those exhibits. While we may take judicial notice of the existence of the audit report, Web sites, and blogs, we may not accept their contents as true. (*Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 364 [76 Cal.Rptr.3d 146].) "When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable. [Citation.]" (*StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 457, fn. 9 [84 Cal.Rptr.2d 843, 976 P.2d 214].)

Although the audit report is a government document, we may not judicially notice the truth of its contents. In *Mangini v. R. J. Reynolds Tobacco*

*Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73], overruled on another ground in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276 [63 Cal.Rptr.3d 418, 163 P.3d 106], the plaintiff sought judicial notice of a report of the United States Surgeon General and a report to the State Department of Health Services. The California Supreme Court denied the request: "While courts may notice official acts and public records, 'we do not take judicial notice of the truth of all matters stated therein.' [Citations.] '[T]he taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom, since in many instances what is being noticed, and thereby established, is no more than the existence of such acts and not, without supporting evidence, what might factually be associated with or flow therefrom.' " (*Mangini v. R. J. Reynolds Tobacco Co.*, *supra*, at pp. 1063–1064.)

■ Nor may we take judicial notice of the truth of the contents of the Web sites and blogs, including those of the Los Angeles Times and Orange County Register. (See *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6 [119 Cal.Rptr.2d 709, 45 P.3d 1171] ["The truth of the content of the articles is not a proper matter for judicial notice . . . ."]; *Unlimited Adjusting Group, Inc. v. Wells Fargo Bank, N.A.* (2009) 174 Cal.App.4th 883, 888, fn. 4 [94 Cal.Rptr.3d 672] [statements of facts contained in press release not subject to judicial notice].) The contents of the Web sites and blogs are "plainly subject to interpretation and for that reason not subject to judicial notice." (*L.B. Research & Education Foundation v. UCLA Foundation* (2005) 130 Cal.App.4th 171, 180, fn. 2 [29 Cal.Rptr.3d 710].)

■ The exception is the grant deed. A recorded deed is an official act of the executive branch, of which this court may take judicial notice. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); *Evans v. California Trailer Court, Inc.* (1994) 28 Cal.App.4th 540, 549 [33 Cal.Rptr.2d 646]; *Cal-American Income Property Fund II v. County of Los Angeles* (1989) 208 Cal.App.3d 109, 112, fn. 2 [256 Cal.Rptr. 21].) The grant deed purports to show that Ragland's home was conveyed by the purchaser at the foreclosure sale to another party. While we may take judicial notice of the grant deed, we decline to do so because we conclude it is not relevant to any issue raised on appeal.

In addition, Ragland has not shown exceptional circumstances justifying judicial notice of facts that were not part of the record when the judgment was entered. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085]; *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 737 [137 Cal.Rptr.3d 756].)

## II.

## Defendants' Motion to Strike Portions of Ragland's Opening Brief

Defendants move to strike (1) six passages from Ragland's opening brief that are supported by citations to the exhibits attached to the request for judicial notice or by citations to Web sites outside the record on appeal, and (2) three passages accusing Downey Savings of trying to swindle Ragland to generate cash.

 California Rules of Court, rule 8.204(a)(1)(C) states an appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." We may decline to consider passages of a brief that do not comply with this rule. (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 990 [94 Cal.Rptr.3d 802].) As a reviewing court, we usually consider only matters that were part of the record when the judgment was entered. (*Vons Companies, Inc. v. Seabest Foods, Inc., supra,* 14 Cal.4th at p. 444, fn. 3.)

We have denied Ragland's request for judicial notice; we therefore decline to consider those passages of the appellant's opening brief, noted in the margin, which are supported solely by citations to exhibits attached to that request or to Web sites outside the appellate record.[1] The three passages from the appellant's opening brief accusing Downey Savings of trying to swindle Ragland also are not supported by record references,[2] but we consider those three passages to be argument rather than factual assertions.

---

[1] 1. From page 4, the third full paragraph beginning "In October, 2007, Downeys' publicly traded common stock," through page 6, the citation following the first full paragraph and ending "(. . . http://www.ocregister.com/articles/bank-16076-fremont-fdic.html)."

2. On page 7, footnote 3 that continues from page 6, the second sentence beginning "Between April 2008" and ending "[$543,000 + 14% = $619,020]."

3. From page 7, in the third paragraph, the second sentence beginning "By that time, Downey's" to page 8, the first line ending "(http://www.bankaholic.com/downey-savings/)."

4. On page 8, the second full paragraph beginning "In late July, 2008."

5. From page 9, the third full paragraph beginning "On November 21, 2008" through the first full paragraph on page 10.

6. From page 31, the first full paragraph beginning "Going through a foreclosure can be so stressful" through page 32, the first full paragraph ending "(http://abcnews.go.com/Health/DepressionNews/story?id=5444573&page=1)."

[2] The three passages are

1. On page 16, the first full paragraph beginning "In the present case."

2. On page 16, footnote 4.

3. On page 30, in the first full paragraph, the fourth sentence beginning "Downey Savings took Ms. Ragland's home."

## Standard of Review

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) We liberally construe the evidence in support of the party opposing summary judgment and resolve all doubts about the evidence in that party's favor. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039 [95 Cal.Rptr.3d 636, 209 P.3d 963].)

## Discussion

## I.

### Negligent Misrepresentation Cause of Action

In the first cause of action, for negligent misrepresentation, Ragland alleged: "On or about April 29, 2008, Downey [Savings] represented to Plaintiff that Downey [Savings] could modify Plaintiff's current loan during the time that the legal department was investigating the fraud allegation on Plaintiff's loan. However, in order to do a modification of Plaintiff's loan, Plaintiff would have to be in arrears on her current loan. Downey[ Savings]'s representative then told Plaintiff not to pay April's mortgage payment. Upon . . . Downey[ Savings]'s representations Plaintiff did not pay April's mortgage payment. Thereafter, Downey [Savings] informed Plaintiff that Downey [Savings] could not accept any further mortgage payments from Plaintiff until the legal department investigated the alleged fraud on the initial mortgage."

■ The elements of negligent misrepresentation are (1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. (*Wells Fargo Bank, N.A. v. FSI, Financial Solutions, Inc.* (2011) 196 Cal.App.4th 1559, 1573 [127 Cal.Rptr.3d 589]; *National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50 [89 Cal.Rptr.3d 473].)

In opposition to Defendants' motion for summary judgment, Ragland presented evidence that John or his supervisor represented (1) her loan was not "behind" but he would work with her to modify the loan; (2) she should

not make the April 2008 loan payment because "the worst thing that's going to happen is you are going to have a late fee, we will get this done for you"; and (3) her loan modification request likely would be approved because she was prequalified. Ragland also presented evidence that several days later, on the last day for her to make a timely loan payment for April, John's supervisor told her the loan would be turned over to the legal department because Ragland had reported some of the loan documents were forged. The supervisor told Ragland that Downey Savings would not attempt to collect from her until the matter had been investigated by the legal department.

Ragland presented evidence that in reliance on the representations made by John or his supervisor, she did not make her April 2008 loan payment. Defendants assert Ragland was already in default when she first spoke with John on April 13, 2008, because she failed to make her payment due April 1, 2008. The note stated Ragland's monthly payment was due on the first day of each month, but that the monthly payment would be deemed timely if paid by the end of the 15th day after the due date. In addition, Ragland presented evidence that John told her on April 13, 2008, she was not "behind" but he would work with her to modify the loan. The payments made by Ragland for September and October 2008, which were rejected by Downey Savings, were dated the 16th of the month, and the rejected payment for November 2008 was dated the 14th. At the very least, there is a triable issue of fact whether Ragland was in default when she spoke with John on April 13.

Defendants argue Ragland did not rely on the misrepresentations because she tried to make her loan payments in May, September, October, and November 2008. Ragland made her loan payment by automatic transfer from her checking account. She manually prevented or undid the automatic payments for April, June, July, and August 2008. As Ragland argues in her reply brief, an inference could be drawn that she inadvertently did not stop the May 2008 payment. We draw all reasonable inference in favor of the party against whom the summary judgment motion was made. (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1520 [80 Cal.Rptr.2d 94].)

Defendants argue Ragland's reliance was not justified because she was told her loan was in the foreclosure department and nobody at Downey Savings ever told her she could stop making loan payments. The evidence presented by Ragland created a triable issue of fact whether her reliance was justified. On April 29, 2008, Ragland spoke with Joseph and Claudia at Downey Savings, and they told her Downey Savings was initiating an investigation of her forgery claim; during the investigation, Downey Savings would not accept loan payments; and collection activity was frozen. In May 2008, on receiving a letter stating her loan was in foreclosure, Ragland called Downey

Savings. Her call was transferred several times, until a person named Lilia told her the loan was in Downey Savings's legal department, which would call her back. Nobody from the legal department called Ragland back. In July 2008, Ragland received a letter from Downey Savings, telling her foreclosure proceedings had begun. After receiving the letter, she called Downey Savings and spoke with three different representatives. The third, Leanna, told Ragland the legal department had failed to place a red flag on the loan and it should never have been placed in foreclosure. Ragland's notes from the conversation include the statement, "[f]oreclosure on hold."

 The trial court granted summary judgment against Ragland on the ground she suffered no damages because, on the date of the foreclosure sale, she could not reinstate the loan by tendering $24,804.57—the amount Downey Savings claimed was due and owing. The evidence created at the very least a triable issue of fact on damages. Ragland testified in her deposition that as of the date of the foreclosure sale, "I could have covered the back payments but not the fees, not all the fees." Those fees were tacked on because Ragland's failure to make the April 2008 loan payment placed the loan in foreclosure. However, Ragland presented evidence that she did not make the April 2008 payment because she relied on misrepresentations made by Downey Savings. In July 2008, Downey Savings told Ragland her loan should not have been placed in foreclosure and the foreclosure was "on hold." If Downey Savings wrongfully placed Ragland's loan in foreclosure, as Ragland alleges, then it had no right to demand payment of additional fees and interest to reinstate the loan. Downey Savings could not take advantage of its own wrong. (Civ. Code, § 3517.)

 Defendants point to the December 2, 2008 letter from Ragland's attorney as undermining her claim she could make the past due monthly loan payments. In that letter, the attorney stated that Ragland could not pay the full amount required to bring the loan current and proposed $12,000 of the reinstatement amount be "tacked onto the back end of the loan." Defendants ask, if Ragland could have made all of the past due monthly loan payments, why did she not offer to pay them? The question is rhetorical: If she had offered to pay the past due monthly loan payments, Downey Savings certainly would have rejected the offer, just as now Defendants vigorously argue a tender must be unconditional and offer payment of additional fees.

 Defendants argue Ragland's declaration is inconsistent with her deposition testimony because, in her deposition, Ragland could not identify precisely the people from whom she asked to borrow money to make the past due monthly loan payments. Her declaration is consistent with her deposition testimony. Ragland testified, under oath, in her deposition that as of the date of the foreclosure sale, she "could have covered the back payments but not the

fees." The evidence established she was not behind on her monthly payments when she spoke with John at Downey Savings on April 13, 2008, and Downey Savings rejected her payments for May, September, October, and November 2008. A reasonable inference from this evidence, which we liberally construe in Ragland's favor, is that Ragland would have been able to make the past due monthly payments by the time of the foreclosure sale. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470 [30 Cal.Rptr.3d 797, 115 P.3d 77] ["We stress that, because this is an appeal from a grant of summary judgment in favor of defendants, a reviewing court must examine the evidence de novo and *should draw reasonable inferences* in favor of the nonmoving party."].)

## II.

### Breach of Oral Contract Cause of Action

In her second cause of action, for breach of oral contract, Ragland alleged Downey Savings breached its promise to investigate her allegations of forgery. On appeal, she does not attempt to support a claim of breach of oral contract and argues instead, "[t]he second cause of action for breach of oral promise to investigate should have been labeled as a cause of action for promissory estoppel." While conceding the second cause of action does not include the required allegation of detrimental reliance (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63]), she argues a detrimental reliance allegation may be extrapolated from the fraud cause of action.

The second cause of action did not incorporate by reference the allegations of the fraud cause of action. Ragland argues we must ignore labels, but however labeled, the second cause of action does not allege promissory estoppel. On remand, Ragland may seek leave to amend her complaint to allege a promissory estoppel cause of action.

## III.

### Fraud Cause of Action

In the third cause of action, for fraud, Ragland alleged Downey Savings "falsely and fraudulently" made the representations alleged in the negligent misrepresentation cause of action.

The elements of fraud are (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant knew the

representation was false at the time it was made; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably and reasonably relied on the representation; and (5) the plaintiff suffered resulting damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].)

Defendants argue U.S. Bank was entitled to summary adjudication of the fraud cause of action because no evidence was presented of "a misrepresentation, reliance or damages." As explained in part I. of the Discussion on negligent misrepresentation, Ragland presented evidence in opposition to the motion for summary judgment that was sufficient to create triable issues as to misrepresentation, reliance, and damages.

Defendants do *not* argue lack of evidence of elements (2) (knowledge of falsity) and (3) (intent to deceive) and did not seek summary adjudication of the fraud cause of action on the ground of lack of evidence of either of those elements.[3] Since Ragland submitted evidence creating triable issues of misrepresentation, reliance, and damages, summary adjudication of the fraud cause of action is reversed.

## IV.

### Violation of Section 2924g(d) Cause of Action

In the fourth cause of action, Ragland alleged Defendants violated section 2924g(d) by selling her home one day after the expiration of the temporary restraining order.

Section 2924g(d) reads, in relevant part: "The notice of each postponement and the reason therefor shall be given by public declaration by the trustee at the time and place last appointed for sale. A public declaration of postponement shall also set forth the new date, time, and place of sale and the place of sale shall be the same place as originally fixed by the trustee for the sale. No other notice of postponement need be given. However, *the sale shall be conducted no sooner than on the seventh day after the earlier of (1) dismissal of the action or (2) expiration or termination of the injunction, restraining order, or stay that required postponement of the sale*, whether by entry of an

---

[3] In its notice of motion and separate statement of undisputed material facts, U.S. Bank moved for summary adjudication of two issues (issues 9 and 10) related to the fraud cause of action: "9. U.S. Bank is entitled to summary adjudication against Plaintiff on the third cause of action for Fraud because U.S. Bank did not make an actionable misrepresentation. [¶] 10. U.S. Bank is entitled to summary adjudication against Plaintiff on the third cause of action for Fraud because all of Plaintiff's alleged damages arise from the foreclosure of her property and Plaintiff was incapable of reinstating the loan at the time of the foreclosure."

order by a court of competent jurisdiction, operation of law, or otherwise, unless the injunction, restraining order, or subsequent order expressly directs the conduct of the sale within that seven-day period." (Italics added.)

On November 26, 2008, the trial court issued an order stating: "Plaintiff shall be entitled to a temporary restraining order enjoining the foreclosure sale on December 9, 2008; upon bringing the loan current by Dec[ember] 16. Current is as of Nov[ember] 26, 2008." The foreclosure sale was conducted on December 17, 2008.

### A. *Section 2924g(d) Creates a Private Right of Action and Is Not Preempted by Federal Law.*

In their summary judgment motion, Defendants argued section 2924g(d) does not create a private right of action and is preempted by federal law. Although Defendants do not make those arguments on appeal, we address, due to their significance, the issues whether section 2924g(d) creates a private right of action and whether it is preempted by federal law. Following the reasoning of *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208 [110 Cal.Rptr.3d 201] (*Mabry*), we conclude section 2924g(d) creates a private right of action and is not preempted.

In *Mabry, supra,* 185 Cal.App.4th at page 214, our colleagues concluded Civil Code section 2923.5 may be enforced by private right of action. Section 2923.5 requires a lender to contact the borrower in person or by telephone before a notice of default may be filed to " 'assess' " the borrower's financial situation and " 'explore' " options to prevent foreclosure. (*Mabry, supra,* at pp. 213–214.) Section 2923.5, though not expressly creating a private right of action, impliedly created one because there was no administrative mechanism to enforce the statute, a private remedy furthered the purpose of the statute and was necessary for it to be effective, and California courts do not favor constructions of statutes that render them advisory only. (*Mabry, supra,* at p. 218.)

There is no administrative mechanism to enforce section 2924g(d), and a private remedy is necessary to make it effective. While the Attorney General might be responsible for collective enforcement of section 2924g(d), "the Attorney General's office can hardly be expected to take up the cause of every individual borrower whose diverse circumstances show noncompliance with section [2924g(d)]." (*Mabry, supra,* 185 Cal.App.4th at p. 224.)

The *Mabry* court also concluded Civil Code section 2923.5 was not preempted by federal law because the statute was part of the foreclosure process, traditionally a matter of state law. Regulations promulgated by the

Office of Thrift Supervision pursuant to the Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.) preempted state law but dealt with loan servicing only. (*Mabry, supra,* 185 Cal.App.4th at pp. 228–231.) "Given the traditional state control over mortgage foreclosure laws, it is logical to conclude that if the Office of Thrift Supervision wanted to include foreclosure as within the preempted category of *loan servicing,* it would have been explicit." (*Id.* at p. 231.) Section 2924g(d), as section 2923.5, is part of the process of foreclosure and therefore is not subject to federal preemption.

### B. *The Foreclosure Sale Violated Section 2924g(d).*

Defendants argue the foreclosure sale did not violate section 2924g(d) on the ground the trial court's November 26, 2008 order was not a temporary restraining order because it conditioned injunctive relief on Ragland bringing her loan current by December 16, 2008. That condition was not met, and, therefore, Defendants argue, a temporary restraining order was never issued.

We disagree with Defendants' interpretation of the November 26 order. The foreclosure sale had been scheduled for December 9, 2008. The November 26 order was for all intents and purposes a temporary restraining order subject to section 2924g(d) because the effect of that order was to require postponement of the sale at least to December 16, 2008. The requirement that Ragland bring the loan current by that date was not a condition precedent to a temporary restraining order, which in effect had been issued, but a condition subsequent, the failure of which to satisfy would terminate injunctive relief.[4]

Defendants argue they were entitled nonetheless to summary adjudication of the fourth cause of action because Ragland could not have brought her loan current within seven days of December 16, 2008. Although Ragland submitted evidence that she could pay back amounts due, she did not present evidence she could bring the loan current, including payment of additional fees, as required by the trial court's November 26 order.

The purpose of the seven-day waiting period under section 2924g(d) was not, however, to permit reinstatement of the loan, "but to 'provide sufficient time for a trustor to find out when a foreclosure sale is going to occur following the expiration of a court order which required the sale's postponement' and 'provide the trustor with the opportunity to attend the sale and to ensure that his or her interests are protected.' [Citation]." (*Hicks v. E.T. Legg &*

---

[4] The requirement that Ragland bring her loan current might also be viewed as a condition precedent to a preliminary injunction. But, as the trial court noted: "If plaintiff does bring her payments current by the hearing date, then there is no basis for a foreclosure sale because the arrears would have been cured. Hence there would seem to be no need for the issuance of a preliminary injunction under such circumstances."

*Associates* (2001) 89 Cal.App.4th 496, 505 [108 Cal.Rptr.2d 10].) "The bill [(amending section 2924g(d) to add the waiting period)] was sponsored by the Western Center on Law and Poverty in response to an incident in which a foreclosure sale was held one day after a TRO was dissolved. The property was sold substantially below fair market value. The trustor, who had obtained a purchaser for the property, did not learn of the new sale date and was unable to protect his interests at the sale." (*Ibid.*)

Thus, in obtaining relief under section 2924g(d), the issue is not whether Ragland could have reinstated her loan within the seven-day waiting period but whether the failure of Downey Savings to comply with the statute impaired her ability to protect her interests at a foreclosure sale. Defendants did not raise that issue as ground for summary adjudication of the fourth cause of action.

## V.

### Intentional Infliction of Emotional Distress Cause of Action

In the fifth cause of action, Ragland alleged that in December 2008, Defendants intentionally caused her severe emotional distress by selling her home in a foreclosure sale.

 Defendants argue Ragland cannot recover emotional distress damages—either intentionally or negligently inflicted—because she suffered property damage at most as a result of their actions. (See *Erlich v. Menezes* (1999) 21 Cal.4th 543, 554 [87 Cal.Rptr.2d 886, 981 P.2d 978] [" 'No California case has allowed recovery for emotional distress arising solely out of property damage' . . ."].) *Erlich v. Menezes* and other cases disallowing emotional distress damages in cases of property damage involved negligent infliction of emotional distress. (*Ibid.* [negligent construction of home does not support emotional distress damages]; *Butler-Rupp v. Lourdeaux* (2005) 134 Cal.App.4th 1220, 1228–1229 [36 Cal.Rptr.3d 685] [negligent breach of lease of storage space]; *Camenisch v. Superior Court* (1996) 44 Cal.App.4th 1689, 1693 [52 Cal.Rptr.2d 450] [negligent infliction of emotional distress based on legal malpractice]; *Smith v. Superior Court* (1992) 10 Cal.App.4th 1033, 1040 [13 Cal.Rptr.2d 133] ["mere negligence will not support a recovery for mental suffering where the defendant's tortious conduct has resulted in only economic injury to the plaintiff"].) The rule does not apply to intentional infliction of emotional distress: "[R]ecovery for emotional distress caused by injury to property is permitted only where there is a preexisting relationship between the parties or an intentional tort." (*Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525, 532 [53 Cal.Rptr.2d 24]; see *Cooper v. Superior*

*Court* (1984) 153 Cal.App.3d 1008, 1012 [200 Cal.Rptr. 746] [no recovery for emotional distress arising solely out of property damage "absent a threshold showing of some preexisting relationship or intentional tort"].)

 The elements of a cause of action for intentional infliction of emotional distress are (1) the defendant engages in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, emotional distress; (2) the plaintiff suffers extreme or severe emotional distress; and (3) the defendant's extreme and outrageous conduct was the actual and proximate cause of the plaintiff's extreme or severe emotional distress. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001 [25 Cal.Rptr.2d 550, 863 P.2d 795].) Outrageous conduct is conduct that is intentional or reckless and so extreme as to exceed all bounds of decency in a civilized community. (*Ibid.*) The defendant's conduct must be directed to the plaintiff, but malicious or evil purpose is not essential to liability. (*Ibid.*) Whether conduct is outrageous is usually a question of fact. (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1045 [90 Cal.Rptr.3d 453] (*Spinks*).)

Ragland argues Downey Savings engaged in outrageous conduct by inducing her to skip the April loan payment, refusing later to accept loan payments, and selling her home at foreclosure. She likens this case to *Spinks, supra,* 171 Cal.App.4th 1004, in which the appellate court reversed summary adjudication in the defendants' favor of a cause of action for intentional infliction of emotional distress. The defendants in *Spinks* were landlords of an apartment complex in which the plaintiff resided under a lease entered into by her employer. (*Id.* at p. 1015.) When the plaintiff's employment was terminated following an industrial injury, the defendants, at the employer's direction, changed the locks on the plaintiff's apartment, causing her to leave her residence. (*Ibid.*) The Court of Appeal rejected the contention the defendants' conduct was not outrageous as a matter of law: "First, as a general principle, changing the locks on someone's dwelling without consent to force that person to leave is prohibited by statute. [Citation.] Though defendants' agents were polite and sympathetic towards plaintiff, they nevertheless caused her to leave her home without benefit of judicial process. . . . 'While in the present case no threats or abusive language were employed, and no violence existed, that is not essential to the cause of action. An eviction may, nevertheless, be unlawful even though not accompanied with threats, violence or abusive language. Here the eviction was deliberate and intentional. The conduct of defendants was outrageous.' " (*Id.* at pp. 1045–1046.) In addition, the defendants' onsite property manager had expressed concern over the legality of changing the locks, and the plaintiff was particularly vulnerable at the time because she was recovering from surgery. (*Id.* at p. 1046.)

Defendants argue *Spinks* is inapposite because changing locks on an apartment to force the tenant to leave is unlawful, while, in contrast, Downey Savings proceeded with a lawful foreclosure after Ragland defaulted and had a legal right to protect its economic interests. (See *Sierra-Bay Fed. Land Bank Assn. v. Superior Court* (1991) 227 Cal.App.3d 318, 334 [277 Cal.Rptr. 753] ["It is simply not tortious for a commercial lender to lend money, take collateral, or to foreclose on collateral when a debt is not paid."]; *Quinteros v. Aurora Loan Services* (E.D.Cal. 2010) 740 F.Supp.2d 1163, 1172 ["The act of foreclosing on a home (absent other circumstances) is not the kind of extreme conduct that supports an intentional infliction of emotional distress claim."].)

This argument assumes Downey Savings had the right to foreclose, an issue at the heart of the case. Ragland created triable issues of fact on her causes of action for negligent misrepresentation, fraud, and violation of section 2924g(d). Defendants do not argue Downey Savings would have had the right to foreclose if any of those causes of action were meritorious. Ragland's treatment by Downey Savings, if proven, was at least as bad as the conduct of the defendants in *Spinks* and was so extreme as to exceed all bounds of decency in our society.

## VI.

### Negligent Infliction of Emotional Distress Cause of Action

In the sixth cause of action, Ragland alleged that in December 2008, Defendants negligently caused her severe emotional distress by selling her home in a foreclosure sale. As explained above, Ragland cannot recover under her cause of action for negligent infliction because Defendants' conduct resulted only in injury to property. In addition, she cannot recover for negligent infliction of emotional distress because she cannot prove a relationship giving rise to a duty of care.

There is no independent tort of negligent infliction of emotional distress; rather, "[t]he tort is negligence, a cause of action in which a duty to the plaintiff is an essential element." (*Potter v. Firestone Tire & Rubber Co.*, *supra*, 6 Cal.4th at p. 984.) "That duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." (*Id.* at p. 985.)

Ragland asserted a "direct victim" claim for negligent infliction of emotional distress rather than a "bystander" claim. " 'Direct victim' cases are cases in which the plaintiff's claim of emotional distress is not based upon witnessing an injury to someone else, but rather is based upon the violation of a duty owed directly to the plaintiff. '[T]he label "direct victim" arose to

distinguish cases in which damages for serious emotional distress are sought as a result of a breach of duty owed the plaintiff that is "assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." [Citation.] In these cases, the limits [on bystander cases . . . ] have no direct application. [Citations.] Rather, well-settled principles of negligence are invoked to determine whether all elements of a cause of action, including duty, are present in a given case.' " (*Wooden v. Raveling* (1998) 61 Cal.App.4th 1035, 1038 [71 Cal.Rptr.2d 891].)

Ragland argues a relationship between her and Defendants, sufficient to create a duty of care, arose by virtue of (1) the implied covenant of good faith and fair dealing in the loan documents and (2) financial advice rendered by John or Joseph during the telephone calls in April 2008.

■■ The implied covenant of good faith and fair dealing is a contractual relationship and does not give rise to an independent duty of care. Rather, " '[t]he implied covenant of good faith and fair dealing is limited to assuring compliance with the *express terms* of the contract, and cannot be extended to create obligations not contemplated by the contract.' " (*Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1094 [8 Cal.Rptr.3d 233].) Outside of the insured-insurer relationship and others with similar qualities, breach of the implied covenant of good faith and fair dealing does not give rise to tort damages. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 692–693 [254 Cal.Rptr. 211, 765 P.2d 373]; see *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 61 [86 Cal.Rptr.2d 855, 980 P.2d 407] [no tort recovery for breach of implied covenant arising out of performance bond]; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516 [28 Cal.Rptr.2d 475, 869 P.2d 454] ["In the absence of an independent tort, punitive damages may not be awarded for breach of contract . . ." even when the breach was willful, fraudulent, or malicious]; *Mitsui Manufacturers Bank v. Superior Court* (1989) 212 Cal.App.3d 726, 730–732 [260 Cal.Rptr. 793] [commercial borrower may not recover tort damages for lender's breach of implied covenant in loan documents].)

■■ No fiduciary duty exists between a borrower and lender in an arm's length transaction. (*Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 466 [51 Cal.Rptr.3d 561]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653]; *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 476 [261 Cal.Rptr. 735].) "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 [283 Cal.Rptr. 53].)

Relying on *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362 [229 Cal.Rptr. 16] (*Barrett*), Ragland argues Downey Savings exceeded the scope of its role as a lender of money because John and Joseph gave her what amounted to investment advice by telling her not to make her April 2008 loan payment. In *Barrett*, the plaintiffs executed personal guarantees to the defendant bank of two loans made to a corporation of which the plaintiffs were the principal shareholders. (*Id.* at p. 1365.) Soon after the loans funded, the plaintiffs were informed the corporation was in technical default because the corporation's liability to asset ratios no longer met the bank's requirements. (*Ibid.*) The bank's loan officer assigned to the matter suggested three different ways to improve the corporation's financial situation. As to the third suggestion, merger or acquisition, the loan officer told the plaintiffs a merging company would be responsible for the loans and the plaintiffs would be released from the guarantees. (*Ibid.*)

The plaintiffs followed the third suggestion, and their corporation merged with another one. The merging corporation soon could not make the payments on the loans. (*Barrett, supra,* 183 Cal.App.3d at pp. 1365–1366.) The assignee of the loans enforced them against the plaintiffs and instituted foreclosure proceedings against their home. (*Id.* at p. 1366.) The plaintiffs sued the bank for various causes of action, including constructive fraud and intentional infliction of emotional distress. (*Ibid.*) The jury returned a verdict in favor of the bank. (*Id.* at pp. 1366–1367.)

The issue on appeal was whether the trial court erred by refusing to instruct the jury on constructive fraud. (*Barrett, supra,* 183 Cal.App.3d at p. 1368.) The Court of Appeal, reversing, concluded substantial evidence supported a constructive fraud theory of recovery. (*Id.* at p. 1369.) Constructive fraud usually arises from a breach of duty in which a fiduciary relationship exists. (*Ibid.*) The court reasoned the bank acted as the plaintiffs' fiduciary because one plaintiff perceived his relationship with the loan officer as "very close," relied on the loan officer's financial advice, shared confidential financial information with the loan officer, and relied on the loan officer's advice about mergers. (*Ibid.*) In addition, a consultant for the merging corporation testified the loan officer assured him the plaintiffs would not be released from their guarantees. (*Ibid.*)

The evidence presented in opposition to the motion for summary judgment did not create a triable issue of Ragland's relationship with Downey Savings. In contrast with the extensive financial and legal advice given by the loan officer in *Barrett*, John or his supervisor at Downey Savings told Ragland not to make her April 2008 loan payment in order to be considered for a loan modification. This advice was directly related to the issue of loan modification and therefore fell within the scope of Downey Savings's conventional role as a lender of money.

The undisputed facts established there was no relationship between Ragland and Downey Savings giving rise to a duty the breach of which would permit Ragland to recover emotional distress damages based on negligence. The trial court did not err by granting summary adjudication of the cause of action for negligent infliction of emotional distress.

## VII.

### Rescission Cause of Action

Ragland concedes her seventh cause of action, for rescission, is no longer viable ("a dead letter") because her home was resold after the foreclosure sale to a bona fide purchaser for value. For that reason too, she states she is no longer asserting claims against DSL and FCI.

## VIII.

### Temporary Restraining Order

Ragland argues the trial court's November 26, 2008 order violated her due process rights because it, in effect, required her to pay nearly $25,000 to bring her loan current or face foreclosure of her home. There are two fundamental problems with Ragland's challenge to the November 26 order. First, an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction, is directly appealable. (Code Civ. Proc., § 904.1, subd. (a)(6).) Ragland did not file a notice of appeal from the November 26 order or from the later order denying her motion for a preliminary injunction. Second, even if Ragland properly had appealed, the sale of her home at foreclosure would have rendered the appeal moot. An appeal from an order denying a temporary restraining order or preliminary injunction will not be entertained after the act sought to be enjoined has been performed. (*Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 10 [244 Cal.Rptr. 581].) "An appeal should be dismissed as moot when the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief. [Citation.]" (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 [98 Cal.Rptr.2d 202].)

Ragland concedes her attempt to halt the foreclosure sale, like her rescission cause of action, is a "dead letter" and she is not seeking to set aside the November 26 order or the order denying a preliminary injunction. She argues, "the denial of due process at the application for temporary restraining order was a substantial factor in [the] trial court's decision to grant summary

judgment in favor of U.S. Bank." We fail to see the connection. In any event, we are reversing the judgment as to U.S. Bank, and affirming summary adjudication only of the causes of action for breach of oral contract, negligent infliction of emotional distress, and rescission.

## DISPOSITION

The judgment in favor of DSL and FCI, and summary adjudication of the causes of action for breach of oral contract, negligent infliction of emotional distress, and rescission are affirmed. Ragland may seek leave to amend in the trial court, as explained in this opinion. In all other respects, the judgment is reversed and the matter remanded for further proceedings. Ragland shall recover costs incurred on appeal.

Aronson, Acting P. J., and Ikola, J., concurred.