Filed 1/31/22  O'Connor v. Fresno-Community Hospital etc. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TERENCE MICHAEL O'CONNOR, JR., | F080109 |
| Plaintiff and Appellant, | (Super. Ct. No. 18CECG01184) |
| v. | |
| FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

Yarra Law Group, H. Ty Kharazi; Thornton Davidson and Thornton Davidson for Plaintiff and Appellant.

Horvitz & Levy, Andrea L. Russi, H. Thomas Watson; Schuering Zimmerman & Doyle, Kat Todd, and Sarah Gosling for Defendant and Respondent Fresno Community Hospital and Medical Center.

Gordon Rees Scully Mansukhani, Danny A. Barak and Kathleen M. Rhodes for Defendant and Respondent Donor Network West.

-ooOoo-

Plaintiff Terrence Michael O'Connor, Jr., sued defendants Fresno Community Hospital (Hospital) and Donor Network West (Donor Network; collectively defendants) for intentional infliction of emotional distress regarding their handling of his daughter's death and the donation of her organs. The trial court sustained defendants' demurrers, concluding O'Connor's claim failed as a matter of law because he did not allege (1) intentional conduct primarily directed at him or (2) reckless conduct in his presence. O'Connor argues the trial court erred by failing to evaluate the full range of defendants' outrageous conduct, which began when defendants formed a plan to recover his daughter's organs without obtaining his consent, continued when defendants effectively ejected him from the hospital when he objected to any organ donation, and concluded with the removal and donation of her organs and tissue without his permission.

We conclude that O'Connor's broader conception of extreme and outrageous conduct is correct, and that his allegations of defendants' intentional conduct directed at him, and reckless conduct in his presence, are sufficient to state a cause of action for intentional infliction of emotional distress. We therefore reverse the judgment.

## FACTS[1]

O'Connor and his ex-wife had a daughter, Brittany. On November 17, 2017, Brittany was admitted to the hospital with a strangulation injury. Upon being informed

---

[1]    Because we are reviewing an order sustaining a demurrer, we are required to accept as true the allegations of facts set forth in the plaintiff's complaint. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.) Therefore, the facts set forth in this opinion are taken from the allegations in plaintiff's fifth amended complaint, the operative pleading, not the third amended complaint, which O'Connor referred to extensively in his appellant's opening brief. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 884 [amended pleading supplants prior complaints and it alone is considered by reviewing court]; *Penziner v. West American Finance Co.* (1933) 133 Cal.App. 578, 582 ["Reference cannot be made to superseded complaints to explain, vary, contradict, weaken or strengthen the allegations of the last complaint"].)

2.

of Brittany's injury and admission to the hospital, O'Connor met with Brittany's treating physicians, was informed that Brittany was in a deep coma, and discussed treatment options with them.

For a few days after Brittany's admission, Hospital's medical staff told O'Connor that Brittany was alive and had a chance of survival. O'Connor was committed to keeping her alive. He felt that Brittany's strangulation was not an accident and suspected foul play. During this time defendants decided that Brittany's organs should be donated.

Defendants intentionally concealed from O'Connor that they intended to remove Brittany's organs and tissue without O'Connor's authorization. Brittany's medical records confirm defendants' conclusion that it was not appropriate to tell O'Connor about the plan for organ removal until after Brittany's organs had been taken.

On Thanksgiving Day, November 23, six days after Brittany's admission, Hospital's medical staff informed O'Connor that Brittany was brain dead. O'Connor demanded a second opinion regarding Brittany's condition before her life support was removed. The medical staff told O'Connor that a second opinion had already been obtained, and that O'Connor would not be allowed to obtain his own second opinion. Against O'Connor's wishes, the hospital withdrew life support measures from Brittany. According to Brittany's death certificate, she died on November 24, 2017.

Before Brittany's death, Donor Network approached Brittany's mother about the possibility of donating Brittany's organs and tissues after death. Donor Network was the United States Department of Health and Human Services designated organ procurement organization for Hospital. O'Connor told Hospital's medical staff and Brittany's mother that he objected to withdrawing life support measures and to the removal of Brittany's organs or tissue because he wanted to preserve any evidence of foul play. O'Connor wanted an autopsy performed and believed that operating on Brittany to obtain organs or tissue would cause any autopsy results to be inaccurate. O'Connor's objections to withdrawing the life support measures became so vociferous that Hospital staff called for

3.

security personnel and police personnel, effectively threatening to have O'Connor ejected from the hospital. O'Connor was given three minutes to say goodbye to his daughter and leave the hospital. O'Connor refused to consent to the donation of Brittany's organs or tissue. Furthermore, Brittany had never signed any instructions regarding the donation of her organs or tissues after death. Thus, O'Connor contends he and Brittany's mother, as the surviving parents, possessed co-equal rights to determine the disposition of Brittany's remains. O'Connor alleges that both defendants were aware that he suspected foul play in Brittany's death and that he did not want her body disturbed before an autopsy was performed.

After Brittany's death, despite O'Connor's expressed objections, Donor Network extracted some of her organs and tissue at the hospital, with their assistance. Arguing that defendants wrongfully designated Brittany's mother as the sole decision maker for the donation, O'Connor alleges defendants' harvesting of Brittany's organs and tissue was done unlawfully, without proper and effective legal authorization or valid permission of both parents. O'Connor alleges defendants knew that he, as Brittany's father, had a legal right to determine the disposition of Brittany's remains and that he objected to any donation of her organs.

O'Connor claims defendants' harvesting of Brittany's organs and tissues therefore interfered with his right to dispose of and inter Brittany's remains, and failed to give him sufficient time to seek court intervention to stop the organ harvesting. O'Connor further alleges that defendants knew the applicable state and federal laws and regulations governing anatomical gifts, acted with intent to violate such laws and regulations, and thereby caused O'Connor emotional distress.

## PROCEEDINGS

In April 2018, O'Connor filed a complaint for tortious interference with human remains, negligence, conversion, intentional infliction of emotional distress, and unfair

4.

business practices against Hospital and Donor Network. Over the next year, a series of amended complaints and demurrers were filed and sustained.

In April 2019, O'Connor filed a fifth amended complaint, the operative complaint (complaint) that alleged causes of action for negligence, negligent interference with human remains, intentional infliction of emotional distress, and intentional interference with human remains. Defendants separately demurred to the claims for intentional infliction of emotional distress and intentional interference with human remains. Both defendants argue that the alleged outrageous act consisted solely of removing Brittany's organs and donating them, and these acts do not rise to the level of actionable outrageous conduct. Defendants also contended the cause of action for intentional interference with human remains was simply another name for the intentional infliction of emotional distress claim.[2]

Both defendants' demurrers argued the intentional infliction of emotional distress claim was defective because O'Connor had not alleged that the outrageous conduct was directed at him or that it occurred in his presence while defendants were aware of his presence.

In July 2019, the trial court sustained defendants' demurrers without leave to amend. The court concluded that O'Connor had not alleged outrageous conduct directed at him. Under the court's interpretation of the complaint, "the basic facts of the case

_____

[2]    In *Christensen v. Superior Court* (1991) 54 Cal.3d 868 (*Christensen*), the California Supreme Court stated the tort described as intentional mishandling of a corpse "is properly categorized as intentional infliction of emotional distress." (*Id.* at p. 905.) "Tort remedies for interfering with the survivors' rights to dispose of a dead body survive today in many jurisdictions. The *Restatement (Second) of Torts* expressly recognized a cause of action for tortious interference with a dead body. The superseding *Restatement (Third) of Torts: Physical and Emotional Harm*, finalized in 2012, continues to recognize the claim, but now treats it as a subcategory of tortious infliction of emotional distress." (Entrikin, *Family Secrets and Relational Privacy: Protecting Not-So-Personal, Sensitive Information from Public Disclosure* (2020) 74 U. Miami L.Rev. 781, 796–797, fns. omitted.)

show that at most defendants' conduct was undertaken without regard to plaintiff's feelings on the matter." Addressing O'Connor's allegation that defendants had acted with reckless disregard of the probability of causing him emotional distress, the court concluded O'Connor was required to allege reckless conduct in his presence and failed to do so because he did not allege he was present when the organs were removed.

In October 2019, O'Connor filed a request for dismissal of the complaint with prejudice for the express purpose of expediting an appeal of the order sustaining the demurrers. Dismissal was entered, which we construe as an appealable judgment.

The issues raised in this appeal have been narrowed by O'Connor's opening brief, which focuses on whether the trial court erred "in defining the scope of Defendants' conduct relative to the cause of action for [intentional infliction of emotional distress]." O'Connor's opening brief expressly accepts the trial court's decision as to the cause of action for intentional interference with human remains. Consequently, this opinion addresses only whether O'Connor has alleged sufficient facts to state a cause of action for intentional infliction of emotional distress.

## DISCUSSION

I.    BASIC LEGAL PRINCIPLES

A.    <u>Standard of Review</u>

In reviewing a judgment of dismissal after a general demurrer is sustained without leave to amend, this court reviews the complaint de novo to determine whether the complaint states facts sufficient to constitute a cause of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; Code Civ. Proc., § 430.10, subd. (e).) Whether a pleading alleges facts sufficient to constitute a cause of action is a question of law. (*Bichai v. Dignity Health* (2021) 61 Cal.App.5th 869, 876.)

In exercising de novo review, we "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] Further, we treat the

demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law." (*City of Dinuba v. County of Tulare, supra,* 41 Cal.4th at p. 865.) Generally, a complaint must allege ultimate facts. (*Burke v. Superior Court* (1969) 71 Cal.2d 276, 279, fn. 4; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2021) ¶¶ 6:123, 6:127, pp. 6-38, 6-42.) To survive a demurrer, "each evidentiary fact that might eventually form part of the plaintiff's proof need not be alleged." (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 872.)

### B. Disposition of Human Remains

California law provides that the right to control the disposition of a decedent's remains (unless other directions have been given by the decedent) devolves upon particular classes of persons, in the order they are named in the relevant statute. (Health & Saf. Code, § 7100.) The decedent's surviving competent parents are the fourth listed class, following agents under a power of attorney for health care, a surviving competent spouse, and surviving competent adult children. (Health & Saf. Code, § 7100, subd. (a)(1)-(4).) The record does not reflect whether Brittany had an agent under a power of attorney for health care, a surviving spouse, or adult children. Consequently, we assume her surviving parents had the statutory right to control the disposition of her remains.

The persons who may make an anatomical gift of a decedent's body or part for purposes of transplantation, therapy, research, or education are delineated by California's Uniform Anatomical Gift Act (UAGA). (Health & Saf. Code, § 7150 et seq.) The classes of persons with priority to make an anatomical gift of a decedent's body or part are listed by the UAGA in descending order. (Health & Saf. Code, § 7150.40, subd. (a)(1)-(10).) A decedent's parents are listed fourth out of 10 such classes, following the decedent's authorized agents, spouse, and adult children. (Health & Saf. Code, § 7150.40, subd. (a)(4).) When, as was the case with Brittany, the class with priority has

7.

multiple members, an anatomical gift may be made pursuant to the UAGA by a single member of the class, "unless that member or a person to which the gift may pass under Section 7150.50 knows of an objection by another member of the class. If an objection is known, the gift may be made only by a majority of the members of the class who are reasonably available." (Health & Saf. Code, § 7150.40, subd. (b).) The UAGA seeks to balance two competing policy interests: the need for organ donations for transplantation and research purposes (for which time is usually of the essence) and the religious and moral sensibilities of those who do not wish to donate organs. (*Lyon v. United States* (D.Minn. 1994) 843 F.Supp. 531, 536.)

California law requires general acute care hospitals to develop a protocol for identifying potential organ and tissue donors. (Health & Saf. Code, § 7184, subd. (a).) The protocol must require that any deceased individual's next of kin be asked whether the deceased was an organ donor and, if not, the family must be informed of the option to donate organs and tissues pursuant to the UAGA. (*Ibid.*) Any such donation shall take place only with "the approval of the designated next of kin or other individual, as set forth in Section 715[0.40]."[3] (*Ibid.*) The required protocol "shall encourage reasonable discretion and sensitivity to the family circumstances in all discussions regarding donation of tissue or organs." (*Ibid.*)

Federal law requires all hospitals participating in the Medicare program to establish a written protocol for identifying potential organ donors. (42 U.S.C. § 1320b-8(a)(1).) The protocol must (1) assure that family members are made aware of both the donation option and their option to decline; (2) encourage "discretion and sensitivity with respect to the circumstances, views, and beliefs" of such families; and (3) require that

---

[3]     The quote actually refers to Health and Safety Code section 7151, which was repealed in 2007 and replaced with Health and Safety Code section 7150.40; however, section 7184 has yet to be revised to reflect such change.

such hospital's designated organ procurement organization is notified of potential organ donors.  (42 U.S.C. § 1320b-8(a)(1)(A)(i)-(iii).)

## II.    SUFFICIENCY OF THE FACTS ALLEGED

O'Connor's appeal is narrowed on the issue of whether the facts alleged are sufficient to state a cause of action for intentional infliction of emotional distress, specifically whether the trial court erred in limiting the range or scope of defendant's alleged outrageous conduct.  Both defendants adopt the trial court's rationale and contend that O'Connor's claim fails as a matter of law because he did not allege (1) intentional conduct primarily directed at him or (2) reckless conduct in his presence.  In response, O'Connor argues the trial court erred by failing to evaluate the full range of defendant's reckless and outrageous conduct, which began when defendants formed a plan to recover Brittany's organs without obtaining his consent, continued when defendants effectively ejected him from the hospital when he objected to any organ donation, and culminated with the removal and donation of Brittany's organs and tissue without his permission.

### A.    Identifying the essential elements of the cause of action

The elements of a cause of action for intentional infliction of emotional distress are ' " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct....' " ' (*Christensen*, *supra*, 54 Cal.3d at p. 903.)  The first element consists of two components—the defendant must engage in extreme and outrageous conduct and must have a culpable state of mind, either intentional or reckless.

The first component—extreme and outrageous conduct—exists when the conduct is " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " (*Christensen*, *supra*, 54 Cal.3d at p. 903.)  This test is not a bright line

9.

standard. (*So v. Shin* (2013) 212 Cal.App.4th 652, 671.) The generality of the test requires "a case-by-case appraisal of conduct filtered through the prism of the appraiser's values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical." (*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1128.) Consequently, whether conduct is "outrageous" ordinarily is a question of fact. (*So v. Shin*, *supra*, at p. 672; see CACI No. 1602 [outrageous conduct defined].)

Despite the generality of the test for outrageous conduct, case law has established some general guidelines. Mere "insults, indignities, threats, annoyances, petty oppressions or other trivialities" are not actionable "outrageous conduct." (*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 155, fn. 7; *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1265-1266; CACI No. 1602.) To be actionable, the conduct must be egregiously outside the realm of civilized conduct. (*Yurick v. Superior Court, supra,* 209 Cal.App.3d at p. 1129.) Deprivation of a statutory right, in and of itself and without additional conduct, is insufficient to be "extreme and outrageous." (*Lee v. Travelers Companies* (1988) 205 Cal.App.3d 691, 695.) However, conduct not objectively "extreme and outrageous" may become so where a defendant acts in the face of knowledge that a plaintiff is peculiarly susceptible to emotional distress, by virtue of age, or some physical or mental condition or idiosyncrasy. (See *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1008; *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1031-1032; *McDaniel v. Gile* (1991) 230 Cal.App.3d 363, 372.)

The second component—a culpable state of mind—exists when a defendant engages in outrageous conduct with either " ' "the intention of causing, or reckless disregard of the probability of causing, emotional distress." ' " (*Christensen*, *supra*, 54 Cal.3d at p. 903.) It is not enough that the conduct be intentional and outrageous. It must be intentional conduct directed at the plaintiff, or conduct in reckless disregard of the

plaintiff's interests, in the presence of a plaintiff of whom the defendant is aware is present. (*Christensen*, *supra*, at p. 903, 905-906; CACI No. 1600.)

B. <u>The allegations of extreme and outrageous conduct are sufficient</u>

We first consider the alleged conduct of Hospital and Donor Network, and evaluate whether it constitutes "extreme and outrageous" conduct for intentional infliction of emotional distress purposes. As noted, O'Connor contends the trial court erred in evaluating the defendants' conduct by failing to consider the full range of the relevant conduct. Particularly, O'Connor contends that the conduct in question was more than the actual harvesting of Brittany's organs—it also included defendants secretly deciding to recover and donate Brittany's organs without obtaining O'Connor's consent, effectively ejecting O'Connor from the hospital when he objected to any organ recovery and donation, and proceeding with removing and donating Brittany's organs and tissue over O'Connor's objections. As explained below, we conclude that O'Connor's broader conception of the conduct at issue is correct; the physical removal and donation of Brittany's organs is not the only conduct relevant to a determination of "extreme and outrageous."

As Brittany's co-parent, O'Connor possessed statutory rights concerning the disposition of her remains and the donation of her organs. Specifically, O'Connor had a right to joint control over the disposition of Brittany's remains upon her death. (Health & Saf. Code, § 7100, subd. (a)(4).) O'Connor also had a statutory right to object to the anatomical gifting of Brittany's body or any part thereof. (Health & Saf. Code, § 7150.40, subds. (a)(4) & (b).)

O'Connor strenuously attempted to exercise his statutory rights at the time he became aware of defendant's plans to take Brittany off life support and harvest her organs. O'Connor has alleged that he made it clear to Hospital and Donor Network that he wanted Brittany kept on life support until an autopsy could be performed on her, that

11.

he did not want any of Brittany's organs or body parts removed, and that he did not consent to organ removal. Not only does the complaint allege that O'Connor made his exercise of his statutory rights to determine the disposition of Brittany's remains and the donation of her organs clear to both Hospital and Donor Network, it alleges that O'Connor's objections to taking Brittany off of life support were strong enough that they were the very reason Hospital security and police were called in, and essentially threatened to eject O'Connor from the hospital.

While deprivation of a statutory right, in and of itself, is insufficient to be "extreme and outrageous" conduct, the complaint alleges defendants did more than merely deprive O'Connor of his statutory rights. The complaint alleges that they engaged in such deprivation at a particularly vulnerable point for O'Connor: the impending death of his daughter, and in a particularly egregious way: by barring O'Connor from being physically present with his daughter as she faced death.

"[O]utrageous conduct is conduct that is intentional or reckless and so extreme as to exceed the bounds of decency in a civilized community." (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 204 (*Ragland*).) Conduct held by courts to be sufficiently egregious to be "extreme and outrageous" has included: a process server banging on plaintiff's door in the middle of the night (*Golden v. Dungan* (1971) 20 Cal.App.3d 295, 309-310); an insurance company threatening to withhold, and actually withholding, disability benefits to which an insured was clearly entitled, in an effort to compel the insured to agree to an unfair claims settlement (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 396-398 (*Fletcher*)); a bank's wrongful foreclosure sale, through alleged fraud and statutory violations, of a plaintiff's home (*Ragland, supra,* at pp. 204-205); and a news crew entering a plaintiff's home without permission, to film the last moments of the plaintiff's husband's life for a documentary on emergency medical services, and ignoring plaintiff's subsequent request not to

12.

broadcast the footage (*Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1487-1488 (*Miller*)).

The parties have not cited, and we have not located, any judicial decision or other authority specifically addressing the limits of what conduct to consider and what conduct to exclude when analyzing whether conduct is "extreme and outrageous." However, there is authority for the proposition that actions on the part of defendants may be "taken alone, or considered together as part of a course of conduct" by a reviewing court evaluating them for their qualitative measure. (*Kiseskey v. Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 229.) Moreover, there are examples of conduct occurring over a prolonged period of time, and encompassing a series of acts, which have been held to constitute "extreme and outrageous" conduct.

In *Fletcher*, the plaintiff sued his disability insurer and its claims supervisor for, among other things, intentional infliction of emotional distress based on a bad faith withholding of disability benefits. (*Fletcher*, *supra*, 10 Cal.App.3d at p. 384.) The jury found the defendants liable for intentional infliction of emotional distress and the trial court denied the defendants' motions for judgment notwithstanding the verdict. (*Id.* at p. 385.) The appellate court affirmed the judgment. (*Id.* at p. 409.)

In *Fletcher*, the appellate court viewed the evidence in the plaintiff's favor and stated the defendants "embarked upon a concerted course of conduct to induce plaintiff to surrender his insurance policy or enter into a disadvantageous 'settlement' of a nonexistent dispute by means of false and threatening letters and the employment of economic pressure based upon his disabled and, therefore impecunious, condition, (the very thing insured against) exacerbated by [the insurer's] malicious and bad faith refusal to pay plaintiff's legitimate claim." (*Fletcher*, *supra*, 10 Cal.App.3d at p. 392.) The conduct began in May 1966 when the claims supervisor began to search for ways to avoid or minimize the claim. (*Id.* at p. 388.) The conduct ended 18 months later in November 1967 when the insurer made a payment covering the previous seven months

13.

and, on the eve of trial, stipulated to a declaratory judgment that the plaintiff was due continuing monthly disability payments so long as he remained totally disabled, up to a maximum of 30 years. (*Id*. at p. 392.)

The defendants in *Fletcher* conceded on appeal that their conduct was outrageous and that the evidence supported the jury's finding of the requisite intent or recklessness. (*Fletcher*, *supra*, 10 Cal.App.3d at p. 394.) However, defendants argued their relevant conduct was restricted to writing two letters and those letters did not cause the plaintiff emotional distress of the requisite severity. (*Id*. at pp. 394–395.) The appellate court rejected these arguments. To summarize, *Fletcher* provides an example of (1) outrageous conduct encompassing a series of acts over a prolonged period and (2) a court rejecting the defendant's narrow view of the relevant conduct.

As with O'Connor, the *Fletcher* defendants acted over a period of time, despite knowing about the plaintiff's particular vulnerability to such conduct, and over the plaintiff's protestations about the conduct in question. Just as the *Fletcher* plaintiff was known to the *Fletcher* defendants to be in a dire financial condition, Hospital and Donor Network knew that O'Connor was in a dire emotional state (indeed, so dire that Hospital and Donor Network all but banished O'Connor from the hospital). Just as the *Fletcher* defendants, over a period of months, disregarded the bona fide basis of their insured's claims and repeatedly denied those claims, Hospital and Donor Network, over a period of days, disregarded the bona fide basis of O'Connor's requests to not have Brittany's organs harvested (as a person designated by law under Health and Safety Code section 7100 as having the legal right to determine the disposition and burial of Brittany's remains), and repeatedly denied those requests. Just as in *Fletcher*, it was the continuing course of Hospital and Donor Network's conduct that was extreme and outrageous.

*Ragland* provides a second example of outrageous conduct encompassing a series of acts over a prolonged period. In *Ragland*, a homeowner sued her lenders over a foreclosure process that took five months and culminated in a foreclosure sale over her

protestations. (*Ragland*, *supra*, 209 Cal.App.4th at pp. 189-191.) The homeowner claimed the lenders engaged in misrepresentation, fraud, negligent and intentional infliction of emotional distress. (*Ibid.*) The trial court granted summary adjudication to one of the defendant lenders on the homeowner's intentional infliction of emotional distress claim. The appellate court reversed, concluding there was a triable issue of fact about whether the lender's course of conduct was sufficiently extreme and outrageous. (*Id.* at p. 187.)

The homeowner had refinanced her residence with the defendant lenders, and she had later sought relief from the increasing interest rates that her adjustable rate mortgage compelled her to pay. (*Ragland*, *supra*, 209 Cal.App.4th at p. 188.) When inquiring about a loan modification, the homeowner was induced by the lender to miss a loan payment in April 2008, thereby wrongfully placing her loan in foreclosure. (*Id.* at p. 187.) In May 2008, the homeowner sought to make a retroactive loan payment, but this payment was refused by the lender. (*Id.* at 189.) The lender also rebuffed the homeowner's efforts at communication, and in July 2008 began foreclosure proceedings. (*Ibid.*) The homeowner continued her efforts to resist the foreclosure, not only on the basis that she had been encouraged by an employee of the lender to miss her payment, but also on the basis that she had informed the lender six years earlier that at least 13 of her original loan documents had her signatures forged on them. (*Id.* at pp. 189-190.) Throughout September, October, and November of 2008, the homeowner also continued her efforts to retroactively make her loan payments, which efforts were consistently rebuffed by the lender. (*Id.* at p. 190.) A foreclosure sale was scheduled for December 2008; the homeowner filed an ex parte application for a temporary restraining order to enjoin that sale. (*Id.* at pp. 190-191.) The homeowner indicated that she was able to pay half of the amount necessary to reinstate her loan, about one-sixth of which amount was for late charges, interest on arrears, property inspection costs, and foreclosure costs. (*Id.* at p. 191.) The homeowner offered to pay all that she could at that time in advance of the

scheduled foreclosure sale, and to have the remainder " 'tacked onto the back end of the loan.' " (*Ibid.*) The lender did not yield in its demand for payment in full of the amount necessary to reinstate the loan, and the foreclosure sale went forward. (*Ibid.*)

The *Ragland* reviewing court concluded that the lender's course of conduct, as alleged in the complaint, "was so extreme as to exceed all bounds of decency in our society." (*Ragland*, *supra*, 209 Cal.App.4th at p. 205.) The alleged actions of the *Ragland* lender are similar to the alleged actions of Hospital and Donor Network, insofar as it was not a single action, but a course of actions, that *Ragland* held were extreme and outrageous. Additionally, as *Ragland* emphasized, while a defendant's conduct must be directed to the plaintiff to support a claim of intentional infliction of emotional distress, "malicious or evil purpose is not essential to liability." (*Id.* at p. 204.) *Ragland* compared the activities of the lenders to a landlord politely and sympathetically changing the locks of an apartment, following the tenant's termination from work after an industrial injury. (*Ibid.*) However polite and sympathetic the defendant's actions were, they still resulted in the loss of a home without benefit of judicial process. So too, the actions of Hospital and Donor Network need not have been threatening, violent, or abusive of O'Connor for the actions to be "extreme and outrageous." It is sufficient that the actions be deliberate and intentional, which O'Connor's pleading indicates with his ejection from the hospital's premises and Donor Network's harvesting of his daughter's organs over his objections. *Ragland* also emphasized that a course of conduct occurring at a time when a plaintiff is "particularly vulnerable" (as O'Connor alleged to be at the time of his daughter's impending death and organ donation) is an aggravating circumstance. (*Ibid.*)

*Miller* provides a third example of outrageous conduct encompassing a series of acts over a prolonged period. In *Miller*, a widow sued a television station for trespass, invasion of privacy, negligent and intentional infliction of emotional distress after the television station's camera crew entered her home without her consent and filmed the

16.

administration of life-saving techniques to her husband (who nevertheless died). The *Miller* trial court granted the television station's motion for summary judgment and concluded that the widow had no actionable claim for trespass, invasion of privacy, negligent infliction of emotional distress, or intentional infliction of emotional distress based upon her alleged viewing of the television station's broadcasts of her deceased husband. (*Miller, supra,* 187 Cal.App.3d at pp. 1473-1474.) The appellate court reversed the lower court's summary judgment rulings on the widow's causes of action. (*Id.* at p. 1493.) The appellate court concluded that the widow's charging allegations were sufficient to describe extreme and outrageous conduct undertaken with reckless disregard for the probability of causing emotional distress. (*Id.* at pp. 1487-1488.)

In *Miller*, the television station's camera crew entered the widow's apartment without seeking or obtaining any permission from her to do so, for the purpose of filming a mini-documentary on fire department paramedics and their work. (*Miller*, *supra*, 187 Cal.App.3d at p. 1475.) The camera crew immediately followed fire department paramedics into the widow's residence and filmed the paramedics administering cardio-pulmonary resuscitation efforts to her husband, which efforts were ultimately unsuccessful. (*Ibid.*) The widow was taken out of the room where the resuscitation efforts were made, and she did not view them. (*Id.* at p. 1476.) The widow was "completely unaware" that the camera crew arrived with the paramedics and filmed their resuscitation efforts on her husband. (*Ibid.*) The camera crew left without contacting the widow to tell her about the mini-documentary or its planned broadcast, believing that was not necessary because the decedent would not be identified in the broadcast. (*Id.* at p. 1475.) The footage filmed on October 30 showing the decedent was broadcast on the 6 p.m. and the 11 p.m. newscasts of November 19. (*Ibid.*) The footage showing the decedent was also used as a lead commercial for a series on cardiopulmonary resuscitation that the television station broadcast the week following its broadcast of the mini-documentary. (*Id.* at p. 1476.)

17.

When the mini-documentary was broadcast, the widow recognized her deceased husband and the efforts that were shown in the mini-documentary, and she called the television station to register her objection to the broadcast. (*Miller, supra,* 187 Cal.App.3d at p. 1476.) The television station was apologetic, but nevertheless subsequently re-broadcast the portion of the documentary showing the decedent for promotional purposes, notwithstanding the objection the widow had registered. (*Id.* at p. 1477.) As with *Fletcher* and *Ragland*, an ongoing course of conduct was held in *Miller* to be extreme and outrageous. Weeks after the camera crew's entry and filming of the resuscitation efforts (at which the widow was not present, just as O'Connor was not present at the time of the harvesting of Brittany's organs and tissues), the *Miller* widow was subjected to the television broadcast of her late husband's fatal medical episode. The fact that the widow, like O'Connor, was not physically present at the time of the filming activities in question, did not undermine her claim for intentional infliction of emotional distress. Moreover, like O'Connor, the *Miller* widow's objections were registered, but disregarded by the defendants. *Miller* concluded that the television station's lack of response to the widow's protestations "suggests an alarming absence of sensitivity and civility." (*Miller*, *supra*, at p. 1488.) The same can be said of defendants' lack of response to O'Connor's protestations. In fact, the defendant's hostility in response to O'Connor's protestations exceeds the actions of the television station in *Miller*, in that Hospital and Donor Network not only disregarded O'Connor's objections to the harvesting of his daughter's organs, they compelled O'Connor to leave the hospital based upon his assertion of such objections.

O'Connor alleges that defendants knew that he was vehemently opposed to the removal and donation of Brittany's organs because O'Connor vociferously asserted his statutory rights to object to such removal and donation. O'Connor further alleges that Hospital and Donor Network nevertheless removed and donated Brittany's organs several days thereafter in spite of O'Connor's asserted statutory rights. We conclude such an

18.

alleged course of conduct is no less egregious under the circumstances than the examples cited above and is sufficient to constitute "extreme and outrageous conduct" for purposes of stating a claim for intentional infliction of emotional distress. Like the circumstances in *Fletcher*, *Ragland*, and *Miller*, the actions of Hospital and Donor Network alleged by O'Connor occurred over several days, and deprived O'Connor of his asserted statutory rights to object to the harvesting of his daughter's organs, at a time of apparent emotional distress and vulnerability for O'Connor. This conduct by Hospital and Donor Network satisfies the requirement of "extreme or outrageous" conduct necessary to constitute the first element of a claim for intentional infliction of emotional distress.

C.     The allegations of defendants' culpable state of mind are sufficient

We next consider whether the alleged extreme and outrageous conduct of Hospital and Donor Network was undertaken with a culpable state of mind. The requisite state of mind exists when a defendant engages in outrageous conduct with either (1) the intention of causing emotional distress or (2) a reckless disregard of the probability of causing emotional distress. (*Christensen*, *supra*, 54 Cal.3d at p. 903.)

1.     *Conduct directed toward plaintiff with the intent to cause emotional distress*

O'Connor's complaint specifically alleged that both Hospital and Donor Network intended to cause him emotional distress when they breached 42 United States Code section 1320b-8, 42 Code of Federal Regulations part 482.45, and Health and Safety Code section 7184. Those statutes and regulations are expressly designed to limit and minimize emotional distress to next of kin resulting from efforts to obtain a donation of an anatomical gift. O'Connor also generally alleged that "Defendants intentionally directed their actions against [him]" and concluded that it was not appropriate to tell him about their plan for organ recovery until after the organs were taken. Rephrasing this allegation, O'Connor stated that (1) defendants' plan or scheme included intentionally concealing the fact they intended to remove Brittany's organs and tissue without his

19.

authorization and (2) the plan and related concealment were done with the intent to deprive him of his legal rights and to cause him emotional injury.

The parties have not cited, and we have not located, any authority stating that the intent to cause emotional distress must be pleaded with particularity or that the factual basis for the motive underlying that intent must be pleaded. Consequently, we apply the general rule that a plaintiff is required to plead only ultimate facts (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1120) and conclude that O'Connor's allegations that defendants intended to cause him emotional distress adequately alleges sufficient intentional conduct for purposes of stating a claim for intentional infliction of emotional distress. (Cf. *Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616, 632 [general allegation of wrongful intent is sufficient to plead a claim for exemplary damages], superseded by statute on another ground as stated in *Hendy v. Losse* (1991) 54 Cal.3d 723, 832, fn. 6.)

In *Miller*, the television camera crew was not even aware of the identity of the plaintiff, and she in fact was escorted to an adjacent room during the time when her husband was in medical distress, and when the efforts to revive him were filmed. (*Miller, supra*, 187 Cal.App.3d at p. 1476.) The television crew's actions were nevertheless held to be sufficiently directed towards the plaintiff in *Miller* to satisfy the pleading requirement for intentional infliction of emotional distress. The actions of Hospital and Donor Network as alleged by O'Connor's complaint are even more directed towards O'Connor than the *Miller* defendants' actions were towards the *Miller* plaintiff and are sufficient to survive a demurrer.

Defendants' argument that O'Connor did not allege intentional conduct primarily directed at him fails because it perceives the outrageous conduct as consisting only of the harvesting of organs and tissue from Brittany, and that conduct was primarily directed at Brittany's body. This argument fails because it does not consider the full scope of defendants' conduct.

Defendants, in essence, ejected O'Connor from the hospital due to the strength of his objections to taking Brittany off of life support. O'Connor's assertion of his statutory rights was the very reason for his removal from the hospital, and the actions that were taken with respect to Brittany's remains were exactly the actions that O'Connor was vociferously opposed to. The reaction of Hospital and Donor Network to O'Connor's assertion of his statutory rights, in other words, was to conduct the very actions those rights were designed to protect, to direct O'Connor to leave the premises at the time he was aware that such conduct was going to take place, and to do so at a time when O'Connor was particularly vulnerable to emotional injury.

Accordingly, the relevant conduct includes (1) defendants' secret plan to harvest organs and tissue without O'Connor's permission, (2) their ignoring his objections to any organ removal, (3) ejecting him, in effect, from the hospital, and (4) completing their plan by harvesting organs and tissue. A sufficient portion of this course of conduct was directed towards O'Connor and his statutory rights to satisfy "[t]he requirement that the defendant's conduct be directed primarily at the plaintiff." (*Christensen*, *supra*, 54 Cal.3d at p. 904.) Moreover, *Miller*, *supra*, 187 Cal.App.3d 1463, illustrates that not every act in an outrageous course of conduct need be directed at the plaintiff.

### 2. *Reckless Conduct*

We also consider the alternate culpable state of mind necessary to state a claim for intentional infliction of emotional distress and evaluate whether O'Connor adequately alleged defendants' outrageous conduct was undertaken with a "reckless disregard of the probability of causing [O'Connor] emotional distress." (*Christensen*, *supra*, 54 Cal.3d at p. 903.)

O'Connor alleged that defendants acted with "reckless disregard of the probability that [he] would suffer emotional distress." Defendants contend O'Connor's allegations are insufficient because he did not plead that the reckless conduct was directed towards

21.

him and he did not plead facts demonstrating his presence and defendants' awareness of his presence.

In this connection, the complaint alleges that Hospital's staff called security and police on O'Connor when he was registering his objections to the donation of Brittany's organs, and gave him only three minutes to say goodbye to his daughter, circumstances notwithstanding. Such conduct was unequivocally directed towards O'Connor and occurred in his presence. Moreover, the timing of O'Connor's functional ejection from the hospital also deprived him of sufficient time to seek judicial intervention on the issue of Brittany's organ removal. These actions, as the complaint alleges, were taken despite O'Connor's rights as Brittany's parent to control the disposition of her remains, as enumerated in Health and Safety Code section 7100, and were aimed specifically at O'Connor.

In *Miller*, the reviewing court noted that the defendants "apparently devoted little or no thought whatsoever" to entering a heart attack victim's residence without permission. (*Miller*, *supra*, 187 Cal.App.3d at p. 1487.) "[L]ittle or no thought" was held by the *Miller* court to constitute the " 'reckless disregard' " of the rights and sensitivities of others that intentional infliction of emotional distress requires, notwithstanding that the *Miller* defendants did not even know the identity of the plaintiff at the time they entered her apartment and did not film her. (*Id.* at p. 1488.) The lack of any specific malicious or evil purpose on the part of the television camera crew when it followed the fire department paramedics into the widow's residence did not matter. By doing so with little or no thought to committing such an "obvious transgression" *Miller* concluded that the camera crew acted with "reckless disregard" of the rights and sensitivities of the widow. (*Ibid.*) So too, Hospital and Donor Network need not have acted with malice or evil; a lack of thought and sensitivity is sufficient to support the reckless conduct element of intentional infliction of emotional distress

22.

As to presence and awareness, O'Connor alleges that Hospital and Donor Network disregarded his objections to the harvesting of his daughter's organs when he voiced them and proceeded with that action (after ejecting O'Connor from the hospital). At the very least the alleged actions of Hospital and Donor Network were undertaken with little or no apparent thought or sensitivity to their likely impact on O'Connor, who was strenuously objecting to them specifically. O'Connor was present and aware that Hospital and Donor Network were working to disregard his asserted rights to object to the harvesting of Brittany's organs: O'Connor had to be present and defendants had to be aware of his presence in order to constructively eject him from the hospital. Such an apparent lack of thought or sensitivity constitutes reckless disregard in the context of a claim for intentional infliction of emotional distress, and O'Connor's presence and defendants' awareness of that presence at the time is manifest.

As was the case in *Miller* and *Christensen*, O'Connor's complaint therefore alleges a sufficient recklessness on the part of Hospital and Donor Network, and knowing presence of O'Connor, even if he was not physically present at the time of the removal of Brittany's organs.

D.    Donor Network's agency argument is misplaced

Donor Network argues that O'Connor never alleged in his complaint that prior to his removal from Hospital's premises he ever directly told any agent of Donor Network about his objections to the donation of Brittany's organs and tissues or about his wish to have an autopsy performed. Donor Network claims it was thereby ignorant of the information necessary for its subsequent conduct to have been undertaken with the intention to cause O'Connor emotional distress or with reckless disregard of the probability of it causing such emotional distress. Donor Network contends that such circumstances preclude O'Connor from establishing intentional and direct conduct on the

23.

part of Donor Network. This argument misreads the complaint, however, and does not properly state the law.

The complaint alleges that Hospital and Donor Network acted as one another's agents, and that they were both aware that O'Connor suspected foul play in Brittany's death, and that they were both aware that O'Connor did not want Brittany's organ's harvested. O'Connor's claim, in essence, is that Hospital and Donor Network worked together with one another as a joint venture to knowingly deprive O'Connor of his statutory rights to object to the donation of Brittany's organs.

Agency is an ultimate fact for pleading purposes and is properly alleged simply by stating one defendant is the agent of a codefendant. (See *Skopp v. Weaver* (1976) 16 Cal.3d 432, 437–438 [the existence of a principal-agent relationship is an ultimate fact that may be pleaded with a general allegation; allegation that defendants acted " 'as agents for the plaintiffs' " was sufficient to survive a demurrer].) Again, at least for pleading purposes, the allegations of the complaint are sufficient to establish a principal-agency relationship between Hospital and Donor Network and are sufficient to establish knowledge on the part of Donor Network of O'Connor's objections to the harvesting of Brittany's organs.[4]

---

[4] Defendants contend the sham pleading doctrine should apply to O'Connor's allegations about objecting to the removal of Brittany's organs. Donor Network contends O'Connor's allegations in his third amended complaint, which were omitted from the operative fifth amended complaint, negate any allegation of its awareness of his objections to organ donation. Specifically, Donor Network asserts the third amended complaint contains contradictory allegations about whether O'Connor actually made objections to the organ donation.

We conclude the contradiction asserted by Donor Network is based on an unreasonable interpretation of the pleadings and, therefore, the sham pleading doctrine does not apply. The allegations in the third amended complaint about defendants' concealment of information that induced O'Connor not to object to the organ donation are reasonably interpreted to mean that he was induced not to object sooner and with more formality (such as seeking legal recourse or lodging a written objection with Hospital), not that he never actually objected. Under this reasonable interpretation of the

In sum, O'Connor's complaint adequately alleges all the elements of a cause of action for intentional infliction of emotional distress against each defendant.  Therefore, the demurrers should have been overruled as to that cause of action.

## DISPOSITION

The judgment is reversed.  The trial court is directed to (1) vacate the entry of dismissal, (2) vacate its order sustaining the demurrers without leave to amend, and (3) enter a new order (a) sustaining the demurrers without leave to amend as to the intentional interference with human remains cause of action and (b) overruling the demurrers as to the intentional infliction of emotional distress cause of action.

O'Connor shall recover his costs on appeal.

FRANSON, ACTING P. J.

WE CONCUR:

PEÑA, J.

SMITH, J.

---

allegations, they do not contradict the allegations elsewhere in the third amended complaint or the allegations in the fifth amended complaint that O'Connor objected to the donation of Brittany's organs.

25.