Filed 7/31/23  Escajeda v. City of San Diego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| JOHN ESCAJEDA, a Minor, etc. et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent. | D080157<br><br><br>(Super. Ct. No. 37-2018-00008994-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Keri G. Katz, Judge.  Affirmed.

Gusdorff Law, Janet Gusdorff; Vaziri Law Group, Siamak Vaziri and Elizabeth C. Munro for Plaintiffs and Appellants.

Mara W. Elliott, City Attorney, Travis M. Phelps, Assistant City Attorney, Meghan A. Wharton, Dave E. Abad and Tyler L. Krentz, Deputy City Attorneys, for Defendant and Respondent.

Pedestrian John Escajeda was paralyzed and suffered massive internal injuries after being struck by a car being driven by Ismael Angeles. Surveillance video from a nearby bus indicates that Angeles entered the intersection against a red traffic light. He has since fled and cannot be located.

Escajeda's attorneys filed this lawsuit against the City of San Diego (City) and others alleging that the intersection constituted a dangerous condition of public property. After the City moved for summary judgment, he refined his theories, contending (1) the traffic signal light malfunctioned, causing Angeles and Escajeda to believe they each had the right of way, and/or (2) the City violated engineering standards by programming the signal with a 1.0 second (as opposed to 1.4 second) red clearance interval.[1]

The trial court granted the City's motion for summary judgment, determining there was no substantial evidence that the lights malfunctioned at the time of the accident and the City was entitled to design immunity (Gov. Code,[2] § 830.6) for designing the signal lights with a 1.0 second red light interval.

On independent review, we agree with these rulings. The City met its summary judgment burden by showing that Angeles entered the intersection against a red light, and Escajeda did not offer evidence creating a triable issue to the contrary. Thus, there was no evidence upon which a jury could find that the signal lights malfunctioned so as to cause Angeles and Escajeda to believe they each had the right of way. Additionally, the City established

---

[1]    A red clearance interval is the amount of time that all of the signals at an intersection stay red following the end of a yellow signal for one of the streets and before the conflicting signal turns green.

[2]    Undesignated statutory references are to the Government Code.

it was entitled to design immunity under *Hampton v. County of San Diego* (2015) 62 Cal.4th 340 (*Hampton*).  Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Ocean View Boulevard runs generally east and west.  It intersects with South 32nd Street (the Intersection), as depicted below:



On September 11, 2017 at about 6:53 a.m., Angeles was driving eastbound on Ocean View at about 33 miles per hour as he approached the Intersection.  Escajeda was standing on the curb at the southeast corner, intending to cross Ocean View and walk northbound on South 32nd Street. At the same time, an MTS bus was travelling westbound on Ocean View, approaching the Intersection.  One of its cameras recorded the scene, including the traffic light facing westbound vehicles.  The video, a screenshot of which is copied below, shows the signal light for westbound traffic at the Intersection was red at 6:53:03 a.m.



*Figure 1 – Red Light for Westbound Ocean View Boulevard*

2017-09-11 06:53:03

The same camera recorded Angeles's car going eastbound through the intersection while the light was red for westbound traffic. The frame copied below, three seconds later, captured the moment before impact:



Angeles

Escajeda

2017-09-11 06:53:06

4

According to an investigating police officer, because the video shows the traffic light was red for westbound traffic, then it also must have been red for eastbound vehicles (i.e., Angeles's direction of travel) as well. An accident reconstructionist calculated that Angeles was about 100 feet from the limit line when his light cycled to red. He continued to travel eastbound for about 2.2 seconds against the red light.

The bus's camera recorded the moment of impact. The force launched Escajeda's body 84 feet. His lawyers inform us that he survived but is completely paralyzed, nourished by a feeding tube and unable to communicate.

Angeles, who was driving on a suspended license, told police at the scene that "[t]he sun was in his eyes and it was bright when he got to the [traffic] light and could not see." Somewhat inconsistently, he also claimed his light was yellow. In any event, he admits never seeing Escajeda, explaining that the sun in his eyes, his windshield was wet and dirty, and his wipers "did not work well." That was an understatement. A police officer described his wiper blades as "rotted."[3]

Escajeda commenced this action in 2018, and in November 2019 filed the operative complaint (Complaint) against Angeles, the City of San Diego, and others.[4] Because only the City's motion for summary judgment is involved in this appeal, we limit our discussion to those claims. The Complaint generally alleges that the Intersection is a dangerous condition of public property in a multitude of ways. It also claims that the crosswalk

---

[3]    Angeles plead guilty to reckless driving in violation of Vehicle Code section 23105, subdivision (a).

[4]    The other named defendants are the County of San Diego and Southwest Traffic Signal Services, Inc.

signal and traffic control lights "malfunctioned and were improperly operated and timed."

In May 2021, the City moved for summary judgment on the grounds that as a matter of law: (1) the Intersection did not constitute a dangerous condition; (2) even if it does, design immunity applies; and (3) under section 830.8, the City is immune for not installing signs or warnings.[5]

In his opposition, Escajeda assumed for purposes of the motion that he began crossing the street as soon as the pedestrian signal "turned to walk," and that Angeles struck him after running the red light.[6] That scenario would be consistent with the bus video, as well as the statement made by Escajeda's brother to police that "they always push the pedestrian signal button at that intersection and always wait for the signal to change before crossing the street."

Supported by a declaration from a traffic engineer, the centerpiece of Escajeda's opposition was that certain standards required a 1.4 second red light interval at the Intersection, but the City had instead designed the system with a 1.0 second delay. He also presented a declaration from an accident reconstructionist, who stated that with a 1.4 second delay, Angeles "would have had additional time" to steer or brake "thereby avoiding the accident." Similarly, Escajeda's "departure from the sidewalk" would have been delayed, "giving him additional time to react . . . and avoid the

---

[5] The trial court found it unnecessary to consider this last point, as do we.

[6] Escajeda's opposition states, "Plaintiff John Escajeda walked into the intersection as soon as he was perceivably able to and his light turned to walk.[fn.] At the same time, Mr. Angeles's light had turned to red and he collided with Mr. Escajeda."

accident," and he "would not have been as far out into the road at the time of impact."

While the motion was pending, additional evidence was produced, including a 15 second video of the Intersection's traffic lights that a police officer recorded on the day of the accident. The trial court allowed additional discovery and briefing to deal with it. Seven months elapsed between the filing of the motion and the hearing.

By the time of the hearing in December 2021, Escajeda's theories had evolved and he now asserted:

> 1. The City was not entitled to design immunity for programming the signal lights with a 1.0 second delay because (a) the red light clearance interval was not specifically approved; (b) there was no evidence of who approved the plan; and (c) using a 1.0 second delay was not the product of "considered engineering judgment."
>
> 2. There was substantial evidence that the City had attempted to repair and/or upgrade the pedestrian signal light at the Intersection as recently as *one day before the accident*. This, in combination with other evidence created a triable issue that the pedestrian signal light malfunctioned.
>
> 3. Angeles "said the light was never red for him"—which created a triable issue that the signal lights malfunctioned, leading Angeles and Escajeda to believe they each had the right of way.

After conducting a hearing, the trial court ruled that the City was entitled to design immunity and there was no evidence creating a triable issue that the signal lights malfunctioned.

7

## DISCUSSION

A. *The Trial Court Correctly Determined There Was No Substantial Evidence That a Signal Light Malfunction Caused the Accident*

Under Code of Civil Procedure section 437c, subdivision (c), a motion for summary judgment shall be granted if all the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. A defendant meets its burden on summary judgment by showing that the plaintiff cannot prove its causes of action, or by establishing a complete defense to the plaintiff's causes of action. (*Id.*, subd. (p)(2).) The burden then shifts to the plaintiff to show a triable issue of fact material to the causes of action or defense. (*Ibid.*) We evaluate a summary judgment ruling independently. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) We give no deference to the trial court's ruling or reasoning and decide only whether the correct result was reached. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

To establish that a signal light malfunction caused the accident, there must be evidence that the traffic signals simultaneously indicated to Angeles and Escajeda that each had the right of way. This would happen only if Angeles entered the Intersection on a green or yellow light—*and* at the same time—Escajeda's signal indicated something other than "Don't Walk."

On this theory, the City carried its burden on summary judgment by offering admissible evidence that Angeles entered the Intersection on a red light. The bus's video shows a red light for westbound traffic on Ocean View Boulevard at 6:53:03 a.m. The accident occurred about three seconds later. Obviously, the video does not show the signal light that would have been facing Angeles, going eastbound on Ocean View. But a police officer

8

experienced in investigating traffic collisions stated that if the light was red for westbound traffic, it must have also been red for eastbound traffic too:

> "Based on the signal light timing at this intersection, if the lights cycled to yellow, then to red for westbound traffic, then the light cycled to yellow then to red for eastbound traffic also."

The officer concluded, therefore, that Angeles entered the intersection against a red light, stating:

> "When Angeles'[s] light cycled to red, he was approximately 105 feet away from the limit line. He continued to travel eastbound after his signal light had been red for approximately 2.1895 seconds.

> "Angeles said the sun was in his eyes and it was bright when he got to the light and he could not see. . . .

> "When the pedestrian signal cycled to 'walk,' [Escajeda] began to cross the intersection in the marked crosswalk from south to north on South 32nd Street.

> "Angeles drove through the intersection violating the circular red traffic signal and collided into [him]."

The City supplemented this evidence in two ways. First, the police officer who first responded to the accident stated that he checked the traffic signals and saw no malfunctions. Second, the City submitted a declaration from Duncan Hughes, a traffic engineer. He explained that the signals are designed with a fail-safe circuit to prevent conflicts, such as a situation where a driver travelling eastbound (like Angeles) and a pedestrian walking northbound (such as Escajeda), would each simultaneously be given the right of way. Hughes stated that this device "is hard-wired" to prevent conflicting phases. If there is any "problem with a controller, the monitor itself, the 24V power supply, of if signal light wiring is removed or damaged," the conflict monitor "automatically puts the signal into all-red flash mode until the issue

9

is resolved and the monitor is reset." Based on the bus video and the sequencing of signals at the Intersection, Hughes opined that "the traffic signals were operating properly at the time of the collision."

The City also submitted a declaration from John Fisher, a registered traffic engineer with over 50 years' experience in the planning, design, and operation of traffic control devices. In addition to conducting a site inspection, he reviewed police reports pertaining to the accident, traffic surveys, maintenance records, and applicable engineering standards. Like Hughes, he explained that the conflict monitor "operates in the fail-safe mode and ensures that there are no instances of conflicting signal displays." Fisher also concluded, "No systemic traffic signal malfunction was identified in the maintenance records . . . ." He examined records showing that "City signal electricians responded to six service requests in the one-year period prior to the [i]ncident, involving traditional and routine situations typically encountered in urban areas." He further opined that "[w]ork performed by traffic signal technicians at the intersection prior to the [i]ncident and for the two days after [it] . . . identified no signal system malfunctions."

On appeal, Escajeda contends that none of this matters, and a triable issue exists based on a "plethora" of evidence that "a signal malfunctioned" at the Intersection. Chief among this abundant evidence, he claims, is that Angeles "*testified* he went through the intersection under a green light, which is first person percipient evidence of a malfunction at the time of the accident." (Italics added.) Indeed, appellate counsel maintains that the trial court clearly erred because the judge "does not even make mention of the driver's testimony." In his reply brief, Escajeda again claims that both the trial court and the City "ignore the driver's testimony that he drove through the intersection under a green light."

This sounds like a good argument. We often refer to the example of conflicting witness testimony about whether a traffic light was red or green as a prototypical question of fact. (See, e.g., *Schmier v. Supreme Court* (2000) 78 Cal.App.4th 703, 712.) Here, however, Escajeda's briefs contain no record cite for Angeles's supposed "testimony."[7] That alone would allow us to disregard it. (Cal. Rules of Court, rule 8.204(a)(1)(C); see *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 195.) We have nevertheless searched the appellant's appendix for Angeles's testimony—but there is none. What we find instead is a footnote in Escajeda's trial court opposition, which states that his lawyers cannot locate Angeles and as a result have been unable to take his deposition.

That leaves us with Angeles's lawyer-prepared interrogatory answers as the closest thing to testimony. There, he stated "[u]pon information and belief" that his light was yellow (i.e., *not* green). Answering "on information and belief" is lawyer-speak that could be nothing more than wishful thinking. In some sense, it is consistent with the explanation Angeles gave to police at the scene—he never saw Escajeda because the sun was in his eyes, his windshield was wet and dirty, and his wipers did not work.

Accordingly, the evidence on whether Angeles's light was red when he entered the Intersection consists of (1) video showing the westbound light for Ocean View Boulevard was red; (2) expert declarations stating that because the light for westbound traffic was red, so too would have been the one for

---

7    Page 26 of Escajeda's opening brief cites "3RT 69:24-26." But that page contains argument by the City's lawyer, not any testimony from Angeles or anyone else. Escajeda nevertheless doubles down in his reply brief, asserting, "The City and the trial court ignore the driver's testimony that he drove through the intersection under a green light." The only record cite given is "(Opening br., at 26)," which is no cite at all.

eastbound; (3) expert declarations establishing that a fail-safe device precluded conflicting signals; and (4) Angeles's interrogatory response that effectively admits he drove into the Intersection at full speed and effectively blind. Like the trial court, we can only conclude on this record that Angeles entered the intersection on a red light and there was no substantial evidence from which a reasonable trier of fact could decide otherwise.[8]

Turning his attention to the pedestrian signal, Escajeda insists that a 15 second video taken by a police officer and another video taken by Escajeda's uncle a few days after the incident show the pedestrian signals malfunctioning. He also points to other evidence that seemingly shows the pedestrian signals were repaired or upgraded the day before the accident.

Not surprisingly, the City disputed all of this evidence. But even crediting it for purposes of summary judgment, it does not change the outcome. Given the undisputed evidence that Angeles ran the red light, whether Escajeda's pedestrian signal functioned properly simply is not relevant. If Angeles entered the Intersection on a red light, then no matter what the pedestrian signal showed, it could not have been a cause of the collision. This is perhaps best illustrated by the table below.

---

[8] Escajeda contends that whether the traffic signals were functioning is "questionable" because police officers at the scene did not examine all of the lights and did not "watch [the] signal all the way through." That officers at the scene could have done a more thorough investigation of the signal lights does not undercut the probative value of *other* evidence showing the signals cycled correctly and were equipped with a failsafe device to prevent conflicting signals.

| Signal Light for Eastbound Ocean View Boulevard | Pedestrian Signal for Northbound on South 32nd Street | Result |
| --- | --- | --- |
| Red | "Walk" | Not a malfunction. |
| Red | "Don't Walk" | A malfunction, but if the pedestrian abides by the signal, he does not step off the curb. |
| Red | Something ambiguous, not clearly "Walk" or "Don't Walk" | If interpreted as "Walk," not a malfunction because the opposing traffic has a red light.  If interpreted as "Don't Walk," a malfunction, but if the pedestrian abides by the signal, he remains at the curb. |

For a signal malfunction to have caused this accident, *both* Angeles *and* Escajeda must have been given the right of way.  Having determined there is no substantial evidence that Angeles's light was anything other than red, evidence of a malfunctioning pedestrian signal is irrelevant.  Even were we to assume the evidence created a triable issue that the pedestrian signal malfunctioned, as we have explained it would not be a *material* factual dispute—and only material triable issues preclude summary judgment. (*Romero v. American President Lines, Ltd.* (1995) 38 Cal.App.4th 1199, 1203 [" 'The presence of a factual dispute will not defeat a motion for summary judgment unless the fact in dispute is a material one.' "].)

B.    *The Trial Court Correctly Determined That Design Immunity Applies*

A public entity may be liable for injuries caused by dangerous conditions of public property.  (§§ 830, 835.)  However, section 830.6,

13

commonly referred to as "design immunity," precludes liability for any injury caused by "the plan or design of . . . , or an improvement to, public property." (Advisory Com. notes, foll. § 830.6.) "A public entity claiming design immunity must establish: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Hampton, supra*, 62 Cal.4th at p. 343.) In a proper case, design immunity may be resolved on a motion for summary judgment. (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 939–940.)

Escajeda does not dispute the first element—a causal relationship between the plan or design and the accident. Indeed, the Complaint alleges that Escajeda was injured as a "legal, direct and proximate result" of the dangerous condition of public property. (See *Cayley v. Nunn* (19876) 190 Cal.App.3d 300, 306 [defendant moving for summary judgment can rely on allegations in plaintiff's complaint].)

As for the discretionary approval element based on the 1.0 second red interval, a public entity can establish this element with a declaration stating the plans were approved by the entity's engineer, and the plans themselves show they were signed by the engineer in such capacity. (See *Laabs v. City of Victorville* (2008) 163 Cal.App. 4th 1242, 1263 [city established discretionary approval where city engineer declared another city engineer had approved plans, and where plans themselves showed they had been signed and approved by second engineer in his official capacity].) In this case, the City met its summary judgment burden on this element by filing a declaration from Duncan Hughes, the Deputy Director of the City's Traffic Engineering Division, which stated:

14

1.  Plans for constructing the signal lights at the Intersection were approved in July 1962 "by City representatives from the Engineering Department prior to the start of construction, indicating that the design was approved by the City." The signature sheet of these plans was lodged.

2.  In 1981, plans for constructing the traffic signal at the Intersection were approved by "City representatives" from the engineering department prior to the start of construction, "indicating that the design was approved by the City." This construction replaced "almost all of the equipment, conduit, and wiring" that was installed in 1962. The signature page of these plans was lodged.

3.  Additional work was done in November 1997 under plans signed by a representative of the City engineering department, "indicating that the design was approved by the City." The plans called for the installation of new conduit and communications cable underground. The work was completed in 1998 and had "no impact on the traffic signal design from the 1981 plans." The signature pages of these plans were lodged.

4.  In June 2011, new sewer mains and pedestrian ramps were constructed on Ocean View Boulevard and vicinity, which was completed in January 2014. Nothing in the scope of that work affected the operation of the traffic signal equipment as constructed through the 1981 plans. The plans were lodged.

5.  The City installed "high visibility . . . crosswalks and advance limit lines at the [I]ntersection" in December 2016. Hughes approved and signed the plans himself.

On the third element of design immunity, the City also carried its burden of establishing the reasonableness of its approvals. In deposition testimony, Hughes stated that a 1.0 second red clearance interval is "right in the middle of the California [Manual on Uniform Traffic Control Devices (MUTCD)] range of 0.1 to 2 seconds." He noted that in the exercise of "engineering

judgment," for "unusual configurations," that time period could be increased, but "we default to a 1.0 second red clear at the end of every phase." Although recognizing there are other "recommended practice[s]," Hughes explained the City's view that "1.0 second is adjustable upwards in special circumstances" based on the judgment of the particular engineer who is evaluating the particular signal. He concluded that the Intersection is, therefore, in compliance with the current California MUTCD guidelines.

The City bolstered this showing with a declaration from its expert, Fisher, who stated that a red clearance interval of 1.0 second "met and exceeded the guidelines" of California MUTCD. He further explained that "[t]he conflict monitor operates in the fail-safe mode and ensures that there are no instances of conflicting signal displays."[9]

On appeal, Escajeda contends the 1.0 second all red delay was "too short" and "there is a clear dispute of material fact" whether it complied with the California MUTCD. Opposing summary judgment, he submitted a declaration from Richard Haygood, a traffic engineer, who opined that engineering practices must be used in setting the delay, and the Institute of Transportation Engineers (ITE) establishes a formula that in this case required the delay to be 1.4 seconds. Haygood criticized City engineers, stating that their adoption of a 1.0 second delay as a default rule was not reasonable nor did it comport with engineering practices.

---

[9] He also reviewed accident statistics and concluded that from 2008 to the time of the incident, "there was only one prior collision which involved an eastbound or westbound vehicle on Ocean View Boulevard colliding with a pedestrian in a crosswalk." The pedestrian in that accident was on a scooter, admitted he was not paying attention, and crossed against a steady red hand "Don't Walk" signal.

In urging reversal, Escajeda contends there was "no evidence" that the City exercised "any engineering judgment" regarding the red light interval. He maintains that the California MUTCD was amended in 2009 and 2014, requiring the City to "reassess" the 1.0 second default setting "under the revised ITE test." Because Hughes admitted that the City did not do so, while at the same time insisting that they relied on the California MUTCD as the expression of engineering judgment, Escajeda maintains there is a triable issue that the City failed to follow its own standards in setting the red light interval at the Intersection. He concludes that this "absence of judgment" precludes application of design immunity.

In the past this might have been a good argument, but it is now foreclosed by the Supreme Court's decision in *Hampton*.[10] There, a driver injured in an automobile accident and his wife sued the County of San Diego for a dangerous condition of public property. They alleged that the intersection where the collision occurred "afforded inadequate visibility under applicable County design standards" because of a high embankment. (*Hampton*, *supra*, 62 Cal.4th at p. 344.) In opposing a motion for summary judgment based on design immunity, the plaintiffs argued there were disputed issues regarding discretionary approval because the plans for the intersection did not show the embankment. (*Id*. at p. 345.) They asserted that an engineer can only make a discretionary decision to approve a design, despite its nonconformity with governing standards, if the engineer is aware of the nonconformity. According to plaintiffs, " 'an engineer who approves a nonconforming design on the mistaken belief it conformed to governing

---

[10] Although the City frequently cites *Hampton* in its brief, Escajeda chose to not discuss or cite it in his reply.

standards has acted through inadvertence, not discretion.' " (*Id.* at pp. 348–349.)

The Supreme Court disagreed, explaining that the plaintiffs' argument conflated two different elements of design immunity. The court held that the discretionary approval element of section 830.6 "does not implicate the question whether the employee who approved the plans was aware of design standards or was aware that the design deviated from those standards." (*Hampton, supra*, 62 Cal.4th at p. 343.) Nor does the discretionary approval element require the entity to show that the employee who approved the plans had authority to disregard applicable standards. (*Ibid.*) Rather, the discretionary approval element may be established "*either* by evidence of appropriate discretionary approval *or* evidence that the plan conformed with previously approved standards." (*Id.* at p. 350.)

Thus, the discretionary approval element of design immunity asks only whether a person given discretion to approve the design or plan actually approved it. (*Hampton, supra*, 62 Cal.4th at p. 357.) Courts do not inquire whether the City engineer who approved the design was aware of any change in standards. Nor do we consider whether it was wise to approve the plan.

Here, for example, the only issue on this second element of design immunity is whether someone with discretion to approve the design of the signal lights at the Intersection did in fact approve it. (*Hampton, supra*, 62 Cal.4th at p. 357.) As explained above, the evidence offered by the City on this point established such approval—and on appeal Escajeda does not contend otherwise. His argument is that there were contested issues of fact "as to whether the City actually had a plan or used engineering judgment given changed directives in the California MUTCD"—not that the engineer

approving the plans lacked authority to do so.  (Capitalization and boldface omitted.)

Only when considering the third and final element of design immunity—reasonableness of the design—does a court consider whether an employee approved a design that deviates from applicable standards, and whether it was wise to approve the plan.  (*Hampton*, *supra*, 62 Cal.4th at pp. 351, 357.)  But significantly, section 830.6 requires only that "the trial or appellate court determine[ ] that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor . . . ."  In other words, to establish the third and final element of design immunity, the government does not have to prove that the design was reasonable—it only has to introduce sufficient evidence to sustain a finding that it was, even if that evidence is disputed.

In this important way, "a case involving design immunity does not function as a typical summary judgment case would."  (*Menges v. Department of Transportation* (2020) 59 Cal.App.5th 13, 21 (*Menges*).)  In a typical summary judgment motion, if the court determines there is conflicting evidence on a material issue, the motion must be denied.  But here, where the third element of design immunity is the issue, section 830.6 provides that the government merely has to introduce sufficient evidence to sustain a finding in its favor, even if that evidence is disputed.  (*Menges*, at p. 21.)

Substantial evidence to establish this third element may consist of (1) "[d]iscretionary approval of the design plans themselves [citation]; [(2)] the expert opinion of a civil engineer as to the reasonableness of the design [citation]; or [(3)] evidence the design or plan complies with prevailing professional standards [citation].  'A mere conflict in the testimony of expert witnesses provides no justification for the matter to go to a lay jury who will

19

then second-guess the judgment of skilled public officials.' " (*Menges*, *supra*, 59 Cal.App.5th at p. 21.)  Thus, in this unique context, the City is entitled to judgment if there is *any* reasonable basis upon which a public official could have approved the design, even if the evidence on that question is conflicting and would otherwise present a triable issue of fact.[11]

Here, the City introduced expert opinion evidence that its approval of the signal design was reasonable.  Fisher's declaration states, "the plans for the Incident location were reasonable such that competent professionals could have approved them."  Elaborating, he concluded, "there were no defective roadway features, traffic controls, sight distance limitations, street lighting issues or evidence of signal system malfunctions."  Further, "California MUTCD-compliant traffic control devices were present as approved by qualified engineers."  This satisfies the third element of the design immunity defense.[12]

Design immunity "does not necessarily continue in perpetuity."  (*Cornette v. Dept. of Transportation* (2001) 26 Cal.4th 63, 66.)  In seeking reversal, Escajeda further contends that the trial court ignored evidence of "changed conditions"—e.g. increased traffic volumes and prevailing speeds—that reasonably would have required engineers to reassess whether the 1.0 second red light delay interval was appropriate.  This argument, however, is waived

---

[11]    Especially in his reply brief, Escajeda's argument misses this crucial point.  He asserts, "On summary judgment, the question is not which expert is correct or most believable.  Instead, the question is whether there are disputes of fact . . . ."  That may be true in every other summary judgment context, but not with respect to the third element under section 830.6.

[12]    Because of this disposition, it is unnecessary to address the City's contention that the undisputed evidence established the plans conformed to all applicable engineering standards.

by Escajeda's failure to raise it in the trial court. In response to the City's separate statement of undisputed facts, Escajeda stated he "does not contend there were any changed roadway conditions" that would cause the City to lose design immunity. Accordingly, we agree with the City that it cannot be raised for the first time on appeal. A party may not change positions and adopt new and different theories on appeal; it is unfair to the trial court and manifestly unjust to the opposing party. (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241; *Magallanes de Valle v. Doctors Medical Center of Modesto* (2022) 80 Cal.App.5th 914, 924.)

## DISPOSITION

The judgment is affirmed. The City is entitled to costs incurred on appeal.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DO, J.